[No. A126149. First Dist., Div. Five. Aug. 31, 2010.]

COTCHETT, PITRE & McCARTHY, Plaintiff and Respondent, v. UNIVERSAL PARAGON CORPORATION et al., Defendants and Appellants.

1408

COUNSEL

Gibson, Dunn & Crutcher, Daniel M. Kolkey, Kaiponanea T. Matsumura and Gina Moon for Defendants and Appellants.

Cotchett, Pitre & McCarthy, Nancy L. Fineman, Philip L. Gregory; Ropers, Majeski, Kohn & Bentley and Susan H. Handelman for Plaintiff and Respondent.

OPINION

**NEEDHAM, J.**—Appellant Universal Paragon Corporation, formerly known as Tuntex (USA), Inc. (UPC), hired respondent law firm Cotchett, Pitre & McCarthy (CP&M) to represent it in complex environmental litigation. After

a settlement in the underlying action was reached, UPC and CP&M were unable to agree on the amount of fees owed to CP&M under their written fee agreement. The parties proceeded to binding arbitration, as provided for in the agreement, and the arbitrator awarded CP&M $7,554,149.13 in attorney fees and expenses. UPC appeals the superior court judgment confirming the award (Code Civ. Proc., § 1285 et seq.), arguing that the amount is unconscionable and violates public policy. We affirm.

## I. *FACTS AND PROCEDURAL HISTORY*

### A. *The Schlage Lock Site and UPC's Development Plans*

UPC is a real estate development firm. In 1989, it purchased real property in the Brisbane area adjacent to a property owned by the Ingersoll-Rand Corporation (Ingersoll-Rand), known as the "Schlage Lock" site. The Schlage Lock site was contaminated with acid used in metalworks and with fuel from railroad operations by the Southern Pacific Railroad. This contamination was migrating to UPC's property. UPC wished to acquire the Schlage Lock site so it could control the environmental cleanup of that site as well as that of its own property. It planned to develop both properties as part of a larger project.

In 1996, UPC sued Ingersoll-Rand in federal court, seeking to gain control of the Schlage Lock site. The parties agreed to dismiss the case and toll the statute of limitations to see if they could agree on a joint remediation plan or an arrangement for UPC to purchase the property. This tolling agreement expired when UPC's then counsel (not CP&M) failed to renew it and Ingersoll-Rand refused to execute a new agreement. In early 2005, UPC attempted to negotiate the purchase of the Schlage Lock site, but those talks ceased because Ingersoll-Rand insisted on complete indemnity for future litigation arising from the contamination, to be secured by a $200 million line of credit.

### B. *UPC Retains CP&M as Counsel and Negotiates a Retainer Agreement*

In May 2005, UPC retained CP&M to develop a litigation strategy for acquiring the Schlage Lock site so that UPC could clean up the property and proceed with development. UPC initially hired CP&M on an hourly basis, not to exceed $20,000 in fees and costs, for the limited purpose of rendering an opinion on the best way to move forward.

Both UPC and CP&M recognized the risks and extreme difficulties of litigation against Ingersoll-Rand. UPC wanted to avoid upfront attorney fees and allocate some of the risk of litigation to CP&M through a contingency

fee agreement. Because UPC was seeking to acquire the Schlage Lock property, another concern was determining the value of any settlement that included the acquisition of that property. CP&M was concerned that a contingency fee based on the value of the contaminated property alone would be too low.

Between May and July of 2005, UPC and CP&M negotiated the details of a contingency fee retainer agreement designed to meet the parties' various concerns. Attorney Phillip Gregory represented CP&M in the negotiation and UPC was represented by Steve Hanson, its general manager, and attorney Mike McCracken, its outside counsel. CP&M initially proposed a hybrid agreement under which CP&M would charge a reduced hourly rate, plus costs, as well as a 16 percent contingency on any monies received in the resolution of the case with "one-half of hourly billed subtracted from 16%." This proposal was memorialized in a June 2005 draft of the agreement, which also provided that if UPC received property rather than cash, CP&M would get paid with a 2.0 multiplier.

In response to this proposal, Hanson sent an e-mail to CP&M stating that instead of the 2.0 multiplier (the "double fee system," as he put it), UPC "would prefer to agree to value the property and pay 16% including that same percentage on any other settlement cash. In other words we are going to sue for damages, these damages most probably would be over and above the property value anyway." An internal memorandum circulated by CP&M suggested that under this proposal, if UPC made a settlement demand of $20 million, and in response was offered the property for $1, CP&M would get a percentage of $20 million. After CP&M indicated that it would agree to some version of this proposal, the parties continued to work on the language.

Gregory e-mailed Hanson and McCracken, stating, "I will put together a revised contingency agreement tonight and fax it to you. It will provide that in the event of the acquisition of the property by UPC that our Firm receives a 24.5% contingency payment based on the last settlement offer made by UPC to [Ingersoll-Rand], correct?" Hanson responded, "Why would we talk about 24.5% when we were going to pay you some base fees and then pay you 16%[?] That's the deal we like. I guess the question is, can we fairly determine the value of the whole settlement if the property is exchanged? I would think the answer would be reasonably yes."

Gregory sent Hanson a new draft of the fee agreement and copied McCracken on the e-mail. Paragraph 3 of this new version provided, "The settlement of this case may involve [UPC] or a related entity acquiring real property from one or more Defendants. In such an event, the amount of the contingency fee payable to [CP&M] would be difficult to value. If such a

settlement occurs, [UPC] has specifically requested that [CP&M] be paid a percentage of the dollar value of the last settlement offer made to Defendants that does not include acquisition of real property as part of the consideration payable to [UPC]. Therefore, in the event that settlement of the case includes a provision whereby [UPC] or any of its related entities acquires real property from one or more Defendants, the fee payable to [CP&M] shall include two parts: (a) [UPC] shall pay [CP&M] a sum equal to . . . (16%) of the dollar value of the last settlement proposal made by [UPC] to Defendants that did not include, as a component of the settlement proposal, a provision for acquisition of the property; and (b) In addition to the contingency set forth in subparagraph 3(a), above, [UPC] agrees to pay attorneys fees under the May 2005 Hourly Agreement [at reduced rates] . . . An example of the foregoing is attached to this Agreement."

Attorney McCracken sent an e-mail to Gregory and Hanson in which he stated that this draft confused him and proposed the following "solution": "If . . . [Ingersoll-Rand] and UPC reach a global settlement, and a transfer of the property is the consideration, then it follows that the property must first of necessity be assigned a fair market value, which, of course, will [be] done by an MAI [(Member of the Appraisal Institute)] appraiser. . . . The fair market value must, by appraisal practices, be based upon the highest and best use. This will be an amount certain, without regard for deductions for remediation costs, demolition and diminution in value. This is the number that will serve as the base number for calculating the contingency. I will give two examples to illustrate my point [both assume an appraisal of $20M which may or may not be in the ballpark]: [¶] [(1)] The property is appraised at $20M. UPC's total damages [e.g., cleanup insurance, demolition, diminution of value] are $19M. Settlement occurs based on these numbers. UPC writes a check to [Ingersoll-Rand] for $1M. [CP&M]'s contingent fee is ___% of $20M. [(2)] The property is appraised at $20M. UPC's total damages are $25M. Settlement occurs based on these numbers. [Ingersoll-Rand] conveys the property to UPC and writes a check to UPC for $5M. [CP&M's] contingent fee is ___% of $25M."

Gregory responded that McCracken had captured the basic point and asked McCracken to draft the language for the final agreement. McCracken proposed that to "speed things up," Gregory should "simply revise [CP&M's] contingent fee paragraph to reflect [McCracken's] formula: i.e., use fair market value, as determined by an agreed upon MAI appraiser . . . as the basis for calculating the contingent fee . . . . Total damages [e.g., remediation costs, insurance, demolition, diminution in value] will not enter into this analysis, unless of course they exceed the fair market value. . . ." Gregory responded, "Here's the proposal as I understand it: [¶] UPC will be seeking damages totaling [¶] Past costs of remediation, etc. = X [¶] Future Costs of remediation, etc. = Y [¶] Diminished FMV of the property (based on an

appraisal) = Z [¶] UPC's settlement position will be based on X + Y or Z. [¶] If UPC settles with Defendants where Defendants transfer their property to UPC for some consideration from UPC, then the contingency will be calculated by taking an agreed percentage of the greater of [(X + Y) or Z]. [¶] Correct?"

## C. *Final Version of the Retainer Agreement (Including Hypothetical)*

The final version of the retainer agreement was signed by the parties on July 28, 2005. Hanson signed on behalf of UPC after reviewing the agreement with McCracken. The portion of the agreement entitled "FEES AND COSTS" provided as follows: "[UPC] agrees to pay attorneys' fees on the following basis. It is understood that no specific fee is set by law, and that this contingent percentage fee has been specifically negotiated and agreed to between the parties. [¶] 1. The sum of sixteen percent (16%) of the net amounts of any monies recovered by compromise or trial. These monies include any and all sums paid by the Defendants [Ingersoll-Rand] to [UPC] to remediate, clean-up, or pay for loss of value of the property. [¶] 2. In addition to the contingency set forth in paragraph 1, above, [UPC] agrees to pay attorneys fees under the May 2005 Hourly Agreement (attached); however, the hourly rates shall be reduced to $200 for partners and $100 for associates. Should there be a recovery pursuant to paragraph 1, above, [UPC] shall be credited against the above for one-half of the attorneys fees paid, if any[,] to [CP&M]. [¶] 3. The settlement of this case may involve [UPC] or a related entity acquiring real property from one or more Defendants. In such an event, the amount of the contingency fee payable to [CP&M] would be difficult to value. If such a settlement occurs, [UPC] has specifically requested that [CP&M] be paid a percentage of [an] amount equal to the greater of the fair market value (based on its highest and best use) of [UPC]'s real property as determined by a registered MAI appraiser in the litigation (The 'Fair Market Value of the Property'), or the total damages suffered by [UPC] (e.g. remediation costs, insurance, demolition and diminution in value). Therefore, in the event that settlement of the case includes a provision whereby [UPC] or any of its related entities acquires real property from one or more Defendants, the fees payable to [CP&M] shall include two parts: (a) [UPC] shall pay [CP&M] a contingency sum equal to sixteen percent (16%) of the greater of (i) the Fair Market Value of the Property, or (ii) the Total Damages as contained in [UPC]'s most recent damages assessment made for settlement purposes; and (b) In addition to the contingency set forth in subparagraph 3(a), above, [UPC] agrees to pay attorneys fees under the May 2005 Hourly Agreement; however, the hourly rates shall be reduced to $200 for partners and $100 for associates. Should there be a recovery pursuant to this paragraph 3, [UPC] shall be credited against the above for

one-half of the attorneys fees paid, if any. Said sums are due at the time the settlement agreement is executed. An example of the foregoing is attached to this Agreement."

Attached to the retainer agreement was a "Hypothetical Example of Alternative Contingency Described in Paragraph 3 of Fee Agreement." This hypothetical assumed that an MAI appraiser concluded the fair market value of the property at its highest and best use was $20,003,000, and that UPC had performed a damages analysis for settlement purposes and concluded its total damages were $18,000,000, without taking into consideration the acquisition of the property. Assuming UPC accepted an offer by Ingersoll-Rand to sell the Schlage Lock site to UPC for $1 in exchange for indemnification, CP&M would be entitled to 16 percent of the $20,003,000 fair market value of the property after adjusting for litigation costs (which was greater than the $18 million in total damages), and would also be entitled to collect its hourly fees, less a credit to UPC for one-half of the fees paid. The hypothetical also stated, " 'Had [UPC]'s Total Damages been an amount great[er] than the Fair Market Value, then the calculation . . . would have been performed using the Total Damages figure and UPC would owe a contingency fee based on that number.' "

The retainer agreement also provided for arbitration in the event of a dispute over the fee: "In the event that any dispute arises relating to this Agreement or [CP&M]'s performance of services hereunder, it is agreed that such dispute shall be submitted to Judicial Arbitration Mediation Services (JAMS) in San Francisco. [UPC] agrees to submit to the jurisdiction of JAMS (SF) for purposes of enforcing this arbitration. The dispute shall be conclusively decided, without appeal or review, by a mutually agreeable JAMS judge. . . . [UPC] specifically waives a right to a jury trial or court trial to resolve any dispute under this Agreement and understands this waiver after consulting with independent counsel. This agreement to arbitrate is not intended to abrogate [UPC]'s right to require a non-binding fee arbitration pursuant to California Business & Professions Code §§ 6200–6206."

### D. *Litigation and Settlement of the Ingersoll-Rand Litigation*

CP&M filed a complaint against Ingersoll-Rand on behalf of UPC, and Ingersoll-Rand cross-complained against Union Pacific Railroad. The matter was litigated aggressively by CP&M, which filed numerous motions and conducted extensive discovery and negotiations. In September 2006, Hanson sent an e-mail to Gregory estimating the settlement value of the case to be $45 million and the damages to be between $50 million and $80 million. UPC presented a settlement conference statement that estimated its damages to be between $86.5 million and $155.7 million. The following settlement

was ultimately reached: (1) UPC would acquire the Schlage Lock property; (2) Ingersoll-Rand would pay $6 million to UPC for damages; and (3) UPC would have the right to pursue Ingersoll-Rand's claims against Union Pacific Railroad (a right that CP&M believed had no value). UPC was not required to indemnify Ingersoll-Rand as a condition of the settlement.

### E. Fee Dispute and Arbitration

CP&M sent a letter to UPC claiming legal fees of over $19 million, reflecting 16 percent of the average of the damages range set forth in UPC's settlement statement ($86.5 million to $155.7 million). UPC took the position that the contingency should be calculated based on the actual value of the property and cash received in settlement, not on its calculation of damages. As called for by the fee agreement, CP&M initiated arbitration proceedings with JAMS to determine the amount of the fee owed to it by UPC.

UPC demanded a nonbinding fee arbitration under Business and Professions Code sections 6200 to 6206, which was submitted to the San Mateo County Bar Association. The bar association arbitrators awarded CP&M $4,882,063 in fees on a quantum meruit basis. UPC rejected this award and requested that the JAMS arbitration proceed.

The JAMS arbitration was heard before the Honorable Rebecca Westerfeld (ret.). CP&M proposed alternative methods of calculating the fee owed under the agreement that took into account UPC's damages assessment of between $86.5 million and $155.7 million. CP&M alternatively argued that the contingency should be based on the $45 million settlement value that Hanson had placed on the case in September 2006, along with the $6 million in cash received as part of the settlement. UPC responded that the contingency agreement was unconscionable and unenforceable due to a lack of mutual assent, mistake and misrepresentation. It took the position that the parties always intended to base the contingency fee on the value of the property and cash received, not on the damages assessment. UPC urged the arbitrator to calculate the fee based on either the original hourly fee agreement or quantum meruit, which would result in an award of between $1,081,000 and $2,162,000.

Following a two-day arbitration hearing, Judge Westerfeld issued a 36-page decision thoroughly discussing the facts and legal principles applicable to the case and awarding CP&M $7,554,149.13 in fees. She reasoned as follows: The value of the real estate obtained by UPC as part of the settlement, by UPC's own reckoning during the arbitration, was $18.45 million. Although the damages range appearing in the settlement conference statement ($86.5 million to $155.7 million) was inflated for purposes of negotiation, Hanson,

the general manager of UPC, had calculated its damages to be between $50 million and $80 million in September 2006 and had conveyed that figure to Gregory of CP&M. This was the best evidence of UPC's "most recent damages assessment made for settlement purposes" under the retainer agreement, and it exceeded the fair market value of the real property. Using the lower figure of $50 million in damages, CP&M was entitled to 16% of this amount, or $8 million, less $271,936.87 (half of the amount already billed under the hourly fee agreement), less $173,914.00 in litigation costs, for a total award of $7,554,149.13. Judge Westerfeld declined to award prejudgment interest as requested by CP&M.

Judge Westerfeld specifically rejected UPC's argument that the contingency fee agreement was unconscionable. She noted that there had been no disparity in bargaining power between UPC and CP&M; that UPC was a very sophisticated client represented by independent counsel in the negotiation of the fee arrangement; that UPC and its attorney had the opportunity to review the retainer agreement before it was signed; and that CP&M had done an excellent job for UPC, reaching what Hanson had characterized as a "stupendous" result. Contingency fees, in Judge Westerfeld's experience, typically range from 33 percent to 40 percent of a settlement amount, and a contingency of 50 percent is not unconscionable. During the arbitration, UPC itself had valued the settlement at $24.45 million ($18.45 million for the fair market value of the property, plus $6 million in cash), meaning that the approximately $7.5 million in attorney fees fell well within this range. Judge Westerfeld also rejected arguments that the fee agreement and its reference to "Total Damages" was too vague to be enforced.

### F. Petition to Confirm Arbitration Award

CP&M filed a petition to confirm the arbitration award, which was granted by the superior court over UPC's objection. (Code Civ. Proc., § 1286.) The trial court specifically considered and rejected the argument that the award violated public policy. Judgment was entered in favor of CP&M and this appeal follows.

## II. DISCUSSION

UPC urges us to reverse the judgment confirming the arbitrator's award of approximately $7.5 million in attorney fees as unconscionable. CP&M responds that the substance of the arbitration award may not be judicially reviewed because UPC contractually agreed to resolve any fee dispute through arbitration and to be bound by the outcome of that arbitration. UPC argues that judicial review is appropriate because the award violates a

well-established public policy against unconscionable legal fees and thus exceeded the arbitrator's power under Code of Civil Procedure section 1286.2.

The trial court concluded that in light of the arbitrator's findings of fact, UPC had not carried its burden of showing the award of fees was unconscionable and a violation of public policy. (See *Woodside Homes of Cal., Inc. v. Superior Court* (2003) 107 Cal.App.4th 723, 728 [132 Cal.Rptr.2d 35] [party asserting unconscionability as defense has burden of establishing that condition].) We review the trial court's ruling de novo, but defer to the factual and legal findings made by the arbitrator. (*California Faculty Assn. v. Superior Court* (1998) 63 Cal.App.4th 935, 943–945 [75 Cal.Rptr.2d 1]; *Oaktree Capital Management, L.P. v. Bernard* (2010) 182 Cal.App.4th 60, 68–69 [106 Cal.Rptr.3d 16] (*Oaktree*).) "[W]e do not review the arbitrator's findings . . . , but take them as correct." (*Roehl v. Ritchie* (2007) 147 Cal.App.4th 338, 347 [54 Cal.Rptr.3d 185].)

### A. *Limited Judicial Review of Arbitration Awards*

■ Judicial review of an arbitrator's award is very limited because of the strong public policy in favor of private arbitration. (*Board of Education v. Round Valley Teachers Assn.* (1996) 13 Cal.4th 269, 275 [52 Cal.Rptr.2d 115, 914 P.2d 193]; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 8–13 [10 Cal.Rptr.2d 183, 832 P.2d 899] (*Moncharsh*).) As a general rule, the courts may not review an arbitrator's decision for errors of fact or law. (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1361 [82 Cal.Rptr.3d 229, 190 P.3d 586] (*Cable Connection*).) A contractual arbitration agreement gives the arbitrator the power to decide the historical facts, the relevant law and the interpretation and validity of the contract. (See *id.* at p. 1360; *Burlage v. Superior Court* (2009) 178 Cal.App.4th 524, 529 [100 Cal.Rptr.3d 531] (*Burlage*).) Inherent in this power is the possibility the arbitrator may make legal or factual errors. (*Burlage*, at p. 529.) An arbitration award ordinarily will not be vacated due to such error because the arbitrator's resolution of the issues is what the parties bargained for. (*Ibid.*)

■ The general rule that arbitration awards are immune from judicial review is not without its limits. Code of Civil Procedure section 1286.2 lists the grounds on which a court may vacate an award, including "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (*Id.*, subd. (a)(4).) An arbitrator may exceed her powers within the meaning of this section by issuing an award that violates an explicit legislative expression of public policy. (*Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443, 453 [123 Cal.Rptr.2d 122]; *City of Palo Alto v. Service*

*Employees Internat. Union* (1999) 77 Cal.App.4th 327, 334 [91 Cal.Rptr.2d 500]; see also *Eastern Associated Coal Corp. v. Mine Workers* (2000) 531 U.S. 57, 63 [148 L.Ed.2d 354, 121 S.Ct. 462].) But this is the exception, not the rule: "Absent a clear expression of illegality or public policy undermining this strong presumption in favor of private arbitration, an arbitral award should ordinarily stand immune from judicial scrutiny." (*Moncharsh, supra,* 3 Cal.4th at p. 32.)[1]

UPC makes no claim that the arbitration clause in the retainer agreement was itself invalid or unenforceable, or that the fee dispute should not have been submitted to JAMS. Rather, it argues that the arbitrator exceeded her powers by issuing an award that violated the public policy expressed in rule 4-200(A) of the State Bar Rules of Professional Conduct, which provides, "A member [of the bar] shall not enter into an agreement for, charge, or collect an illegal or unconscionable fee." UPC claims the contingency fee was unconscionable within the meaning of this rule because it exceeded the value of the settlement itself and was based on UPC's estimated damages rather than on what it actually received.

■ The State Bar Rules of Professional Conduct are adopted "by the Board of Governors of the State Bar of California and approved by the Supreme Court of California pursuant to Business and Professions Code sections 6076 and 6077 to protect the public and to promote respect and confidence in the legal profession." (Rules Prof. Conduct, rule 1-100(A).) Fee agreements that violate the Rules of Professional Conduct may be deemed unenforceable on public policy grounds. (See *Bird, Marella, Boxer & Wolpert v. Superior Court* (2003) 106 Cal.App.4th 419, 430–431 [130 Cal.Rptr.2d 782]; *Scolinos v. Kolts* (1995) 37 Cal.App.4th 635, 639–640 [44 Cal.Rptr. 31]; *Altschul v. Sayble* (1978) 83 Cal.App.3d 153, 162 [147 Cal.Rptr. 716].)

---

[1] Other exceptions to the general rule of arbitral finality include cases in which the underlying contract or transaction was illegal in its entirety (see *Loving & Evans v. Blick* (1949) 33 Cal.2d 603, 614 [204 P.2d 23] [construction contract with unlicensed contractor illegal]; *Lindenstadt v. Staff Builders, Inc.* (1997) 55 Cal.App.4th 882, 892 [64 Cal.Rptr.2d 484] [trial court must independently decide whether transaction is illegal due to party having acted as unlicensed real estate broker]) and cases in which granting finality to the arbitration would be inconsistent with a party's unwaivable statutory rights (*Pearson Dental Supplies, Inc. v. Superior Court* (2010) 48 Cal.4th 665 [108 Cal.Rptr.3d 171, 229 P.3d 83]; *Cable Connection, supra,* 44 Cal.4th at p. 1353, fn. 14). There is some overlap between these two exceptions and the exception based on a violation of public policy. (See *Moncharsh, supra,* 3 Cal.4th at p. 32.) Although the parties mention all three exceptions in their briefs, we understand UPC's core contention to be that the contingency fee in this case violated a public policy set forth in the State Bar Rules of Professional Conduct. We do not separately discuss whether the contingency fee agreement was illegal or violated UPC's statutory rights because our resolution of the public policy claim necessarily resolves any claim that the arbitration award was reviewable under those other exceptions.

But, it does not necessarily follow that public policy requires the court, rather than an arbitrator, to finally determine whether a fee is unconscionable under the State Bar Rules of Professional Conduct. To the contrary, in cases where the arbitration clause within a contract itself is valid and enforceable (and no claim has been made in this case that it was not), it is up to the arbitrator to resolve a claim that the substance of the contract is unconscionable. (*Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1290 [73 Cal.Rptr.3d 395].) To permit judicial review of the arbitrator's award in this case would be contrary to the strong policy favoring the finality of arbitration awards, even though the amount awarded has been couched as a public policy violation. (See *Moncharsh, supra,* 3 Cal.4th at pp. 9–10.)

The *Moncharsh* decision specifically rejected an argument similar to that made by UPC in this case. In *Moncharsh,* the plaintiff was a former law firm associate who argued that his fee splitting arrangement with the firm was unconscionable and violated the State Bar Rules of Professional Conduct, thereby authorizing judicial review of an arbitration award in favor of the law firm. The Supreme Court disagreed. "We perceive . . . nothing in the State Bar Rules of Professional Conduct at issue in this case that suggests resolution by an arbitrator of what is essentially an ordinary fee dispute would be inappropriate or would improperly protect the public interest." (*Moncharsh, supra,* 3 Cal.4th at p. 33.)

### B. *The Award Was Not Unconscionable*

Assuming that UPC's claim of unconscionability is subject to judicial review as a predicate for determining whether the arbitration award violates public policy, we reject it on the merits.[2] Neither the fee agreement nor the award actually issued by the arbitrator is unconscionable under rule 4-200 of the State Bar Rules of Professional Conduct.

■ Civil Code section 1670.5 codifies the principle that a court may refuse to enforce an unconscionable provision in a contract. Rule 4-200(B) of the State Bar Rules of Professional Conduct (rule 4-200(B)) describes the factors relevant to determining whether a particular legal fee is unconscionable: "Unconscionability of a fee shall be determined on the basis of all the facts and circumstances existing at the time the agreement is entered into except where the parties contemplate that the fee will be affected by later events. Among the factors to be considered, where appropriate, in determining the conscionability of a fee are the following: [¶] (1) The amount of the

---

[2] Reaching the merits of a public policy claim to determine whether an arbitration award is judicially reviewable "creates a tension between enforcing the parties' contractual intent and avoiding wholesale review for legal error." (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2009) ¶ 5:466.1, p. 5-322.) The tension appears to be unavoidable.

fee in proportion to the value of the services performed. [¶] (2) The relative sophistication of the member and the client. [¶] (3) The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly. [¶] (4) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the member. [¶] (5) The amount involved and the results obtained. [¶] (6) The time limitations imposed by the client or by the circumstances. [¶] (7) The nature and length of the professional relationship with the client. [¶] (8) The experience, reputation, and ability of the member or members performing the services. [¶] (9) Whether the fee is fixed or contingent. [¶] (10) The time and labor required. [¶] (11) The informed consent of the client to the fee."

■ The factors listed in rule 4-200(B) include both procedural and substantive aspects of unconscionability, similar to those found in the common law. The doctrine of unconscionability " 'has " 'both a "procedural" and a "substantive" element,' the former focusing on ' "oppression" ' or ' "surprise" ' due to unequal bargaining power, the latter on ' "overly harsh" ' . . . or ' "one-sided" ' results." [Citation.] The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, " 'which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " . . . [¶] Substantively unconscionable terms may take various forms, but may generally be described as unfairly one-sided.' " (*Discover Bank v. Superior Court* (2005) 36 Cal.4th 148, 160 [30 Cal.Rptr.3d 76, 113 P.3d 1100]; see also *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 [99 Cal.Rptr.2d 745, 6 P.3d 669] (*Armendariz*); *D.C. v. Harvard-Westlake School* (2009) 176 Cal.App.4th 836, 868 [98 Cal.Rptr.3d 300]; *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1533 [60 Cal.Rptr.2d 138] (*Stirlen*); *A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 486–487 [186 Cal.Rptr. 114] (*A & M Produce*).)

■ The prevailing view is that procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract, although they need not be present in the same degree. (*Armendariz, supra*, 24 Cal.4th at p. 114.) "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Ibid.*) " '[A] contract is largely an allocation of risks between the parties, and therefore . . . a contractual term is substantively suspect if it reallocates the risks of the bargain in an objectively unreasonable or unexpected manner. [Citations.] But not all unreasonable risk allocations are unconscionable; rather enforceability of the clause is tied to the procedural aspects of unconscionability . . . such that the greater the unfair surprise or inequality of bargaining power, the less unreasonable the risk reallocation

which will be tolerated. [Citation.]' " (*Stirlen, supra,* 51 Cal.App.4th at p. 1532, quoting *A & M Produce, supra,* 135 Cal.App.3d at p. 487.)

 UPC argues that rule 4-200(B) supersedes this approach because it lists specific factors relevant to fees charged by lawyers and does not explicitly require a showing of both procedural and substantive unconscionability. We see no reason not to apply the procedural/substantive analysis to a dispute by a client regarding an allegedly unconscionable legal fee. (See *Shaffer v. Superior Court* (1995) 33 Cal.App.4th 993, 1000 [39 Cal.Rptr.2d 506].) Rule 4-200(B) does not conflict with the more general method of analyzing unconscionability. Instead, it provides a nonexclusive list of factors, both procedural and substantive, that may be relevant when determining whether a legal fee is unconscionable. (*Shaffer,* at p. 1003.)

Rule 4-200(B) superseded former rule 2-107 of the State Bar Rules of Professional Conduct, which had specified that "[a] fee is unconscionable when it is so exorbitant and wholly disproportionate to the services performed as to shock the conscience of lawyers of ordinary prudence practicing in the same community." ("1975" Rules Prof. Conduct, former rule 2-107(B).) In its request that the California Supreme Court approve the amendments to the Rules of Professional Conduct that included the enactment of rule 4-200, the State Bar explained, "Current rule 2-107 prohibits an attorney from charging an 'unconscionable' fee. The rule then explains the factors in determining whether a fee is 'reasonable.' This is ambiguous because unconscionability and unreasonableness are two different standards. The amendments are proposed to remove the ambiguity" by deleting the reference to "reasonableness." (State Bar, Request that the Supreme Court of Cal. Approve Amendments to the Rules of Professional Conduct of the State Bar of Cal. & Memorandum & Supporting Documents in Explanation (1987) at p. 43.) The State Bar also noted that the "[t]he unconscionability standard reflects existing California Supreme Court decisions to the effect that the State Bar has no power to regulate the amount of fees charged by its members unless such fees are so 'outlandish' as to merit discipline or the conduct [of] the attorney in negotiating for or attempting to collect a fee merit[s] discipline." (*Ibid.*) The "outlandishness" of a fee is most readily judged by examining both its procedural and substantive aspects; as with other contractual arrangements, the less evidence there is of substantive unconscionability, the greater the need to show procedural unconscionability, and vice versa. (See *Stirlen, supra,* 51 Cal.App.4th at p. 1532.)

Even assuming it is unnecessary to show both procedural and substantive unconscionability under rule 4-200(B), UPC cannot prevail because in this case there is neither. On the issue of procedural unconscionability, UPC is a sophisticated corporate client that initiated the Ingersoll-Rand litigation to

acquire real property it intended to develop as part of a larger project. It employed outside counsel to negotiate the fee agreement with CP&M, and wielded equal bargaining power during those negotiations. The fee agreement was not a contract of adhesion; if UPC had not been satisfied with its terms, it could have employed any of a number of law firms in lieu of CP&M. This was a private business transaction between equally matched parties, pure and simple. (*Ramirez v. Sturdevant* (1994) 21 Cal.App.4th 904, 913 [26 Cal.Rptr.2d 554] [negotiation of fee agreement is, in general, an arm's length transaction].)

Nor was the contingency fee awarded by the arbitrator substantively unconscionable. A 16 percent contingency rate is less than half of the typical 33 to 40 percent rate noted by the arbitrator. The parties' decision to base the contingency fee on the fair market value of the real estate at its best and highest value after remediation was appropriate in light of the very low value of the property in its unremediated state. UPC conceded during the arbitration that the fair market value of the property in a remediated state was $18.45 million. When added to the $6 million in cash, the total value of the settlement was $24.45 million, meaning that the award of approximately $7.5 million in attorney fees reflects about 30 percent of the total settlement value (as agreed to by the parties), well within the range of reasonable contingency fees. That the fee was based on UPC's estimate of actual damages rather than the fair market value of the property does not render the fee unconscionable when it was within UPC's power to control this estimate.

Moreover, the factors set forth in rule 4-200(B) that are relevant to this case also militate against a finding of unconscionability. Although the fee was substantial, the value of the services to UPC was also great, given that it needed to obtain the property to proceed with its planned development. (Rule 4-200(B)(1).) UPC and CP&M were equally sophisticated parties. (Rule 4-200(B)(2).) The litigation was extraordinarily complex and required a high level of legal skills to obtain a favorable result. (Rule 4-200(B)(3) & (10).) CP&M was an experienced litigation firm that obtained a "stupendous" result for the UPC. (Rule 4-200(B)(5) & (8).) The disputed portion of the fee was contingent in nature (which always presents the possibility that the attorney will be entitled to greater fees than would be recoverable under an hourly fee agreement), and the basis for that contingency had been specifically negotiated by UPC with the assistance of counsel. (Rule 4-200(B)(9).) And in light of its representation by counsel during the negotiation of the retainer agreement, UPC gave informed consent to the fee. (Rule 4-200(B)(11).)

UPC argues that in assessing the conscionability of the settlement, we should look not to the value of the real property at its best and highest value, but to its actual value at the time of settlement in its unremediated state,

which UPC estimates to have been about $1.8 million. UPC posits that when this $1.8 million figure is added to the $6 million in cash, the total value of the settlement was only $7.8 million, meaning that the total fees awarded, when added to those billed under the May 2005 hourly rate agreement, exceeded the actual recovery. Citing *Tarver v. State Bar* (1984) 37 Cal.3d 122, 134 [207 Cal.Rptr. 302, 688 P.2d 911] (*Tarver*), UPC argues that this result is unconscionable because it is " ' " 'so exorbitant and wholly disproportionate to the services performed as to shock the conscience.' " ' "

*Tarver* is readily distinguishable. In that case, the attorney represented the client in an age discrimination action and recovered $31,243.25 in back wages plus reinstatement. (*Tarver, supra,* 37 Cal.3d at p. 128.) The court ordered the defendant to pay $20,600 in attorney fees, but the attorney asserted that under the contingency fee agreement, he was also entitled to 33 1/3 percent of the actual value of the client's future earnings in his reinstated position. (*Id.* at pp. 128–129 & fn. 1.) The court concluded that the fee was unconscionable under former rule 2-107 of the State Bar Rules of Professional Conduct because it was "almost twice the amount of the actual award of monetary damages to his client," even though it was less than the value of the recovery. (*Tarver,* at p. 134.)

The client in *Tarver*—an individual pursuing an employment discrimination claim—stood in a considerably different position than UPC, a sophisticated corporate client that agreed to a very specific contingency fee arrangement after arms-length negotiations through independent counsel. While it might be unconscionable for an attorney to deprive his client of backpay for wrongful termination, after having already been fully and fairly compensated for his legal services, we cannot say that the same is true when a corporation negotiates what turns out to be a large legal fee as part of a strategy for acquiring property for a real estate development project. (Cf. *In re Silverton* (2005) 36 Cal.4th 81, 92–93 [29 Cal.Rptr.3d 766, 113 P.3d 556] [fee arrangement allowing the attorney in a personal injury case to keep 100 percent of any reductions in medical fees negotiated on behalf of the client, over and above the percentage due as a contingency fee, was unconscionable].) In any event, the arbitrator in this case specifically determined that the fair market value of the property plus the cash received was $24.45 million, a factual and legal determination that we cannot revisit at this juncture, even if she was mistaken. (*Oaktree, supra,* 182 Cal.App.4th at p. 69.)[3]

---

[3] At oral argument, appellate counsel for UPC asserted that the arbitrator made no finding regarding the value of the settlement. We disagree. The arbitrator summarized UPC's position as being that CP&M should get no more than 16 percent of $18.45 million, the fair market value of the property. When considering UPC's claim that a contingent fee was unconscionable when based on total damages rather than the actual amount of recovery, the arbitrator noted

UPC argues that a contingency fee based on a damages assessment rather than the actual amount of recovery is unconscionable because it creates a conflict of interest between the attorney and the client. We are not persuaded. " ' "[A]lmost any fee arrangement between attorney and client may give rise to a 'conflict.' An attorney who received a flat fee in advance would have a 'conflicting interest' to dispose of the case as quickly as possible, to the client's disadvantage; and an attorney employed at a daily or hourly rate would have a 'conflicting interest' to drag the case on beyond the point of maximum benefit to the client. [¶] The contingent fee contract so common in civil litigation creates a 'conflict' when either the attorney or the client needs a quick settlement while the other's interest would be better served by pressing on in the hope of a greater recovery. The variants of this kind of 'conflict' are infinite. Fortunately most attorneys serve their clients honorably despite the opportunity to profit by neglecting or betraying the client's interest." ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 416 [87 Cal.Rptr.3d 209, 198 P.3d 11].) The arbitrator concluded that CP&M's representation of UPC was not influenced by the structure of its fee agreement, a conclusion by which we are bound. (*Oaktree, supra*, 182 Cal.App.4th at p. 69.)

We reject UPC's argument that the contingency fee was unconscionable because it effectively applied a multiplier of more than seven times the lodestar based on CP&M's regular hourly rates. (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131–1132, 1133–1134 [104 Cal.Rptr.2d 377, 17 P.3d 735].) UPC relies on inapposite case law concerning statutorily authorized fee awards in favor of a prevailing party. (See *ibid.*) It cites no authority for its implicit assertion that a contingency fee payable by a client under a retainer agreement is unconscionable when it significantly exceeds the amount the attorneys would have billed had they taken the case on an hourly basis—a proposition that that would render unenforceable almost any contingency fee agreement in which the attorney procures an early settlement of a substantial claim.

■ Although the fee agreement in this case was somewhat unusual, it reflected an attempt by equally sophisticated parties to share the risk of complicated litigation. CP&M agreed to a relatively low contingency *rate* (16 percent) and a reduced hourly fee. The fee agreement did not compensate it

---

that contingent fee agreements typically take 33 to 40 percent of the settlement amount, that UPC had valued the settlement to be at most $24.45 million ($18.45 million for the property plus $6 million in cash), and that based on these figures, the fee she awarded was "well within fair perimeters." In so concluding, the arbitrator implicitly, if not explicitly, determined the fair market value of the property to be $18.45 million and the total value of the settlement, including the $6 million in cash, to be $24.45 million. (*Kahn v. Chetcuti* (2002) 101 Cal.App.4th 61, 66 [123 Cal.Rptr.2d 606] [courts must defer to arbitrator's implied findings].) Moreover, the $18.45 million figure is not in dispute because appellate counsel agreed during oral argument that it reflected the fair market value of the property when remediated.

for one component of the settlement that was undoubtedly quite valuable to UPC—Ingersoll-Rand's abandonment of its demand for indemnity. UPC would have us look solely to the fair market value of the unremediated property received as part of the settlement to conclude the contingency fee effectively usurped the entire settlement. But the acquisition of that property was part of a much larger picture—the planned development project. CP&M was rewarded generously due to its successful representation of UPC, but we cannot say that reward was unconscionable or violates public policy when all of the circumstances are considered.

## III. *DISPOSITION*

The judgment of the superior court confirming the arbitration award is affirmed. Ordinary costs on appeal are awarded to respondent CP&M.

Jones, P. J., and Simons, J., concurred.

A petition for a rehearing was denied September 21, 2010, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied November 17, 2010, S187201.