Filed 6/2/14  Wong v. Kopelev CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NORMAN WONG et al., | B241069 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. YS023079) |
| v. | |
| GALINA KOPELEV et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Dudley W. Gray II, Judge.  Affirmed.

Galina Kopelev, in pro. per., for Defendants and Appellants.

The Vanderpool Law Firm, Douglas B. Vanderpool for Plaintiffs and Respondents.

_____

Appellants appeal from a judgment entered after confirmation of an arbitration award. They contend that the award should not have been confirmed and rather should have been vacated.

The court may only vacate an arbitration award under a very narrow set of circumstances. Those circumstances do not exist here, and therefore the judgment must be affirmed.

## BACKGROUND

Appellants Galina and Anatoly Kopelev (Mrs. and Dr. Kopelev)[1] bought a house (referred to herein as either the property or the house) in Palos Verdes Estates (the city) in 1984. They sold the property to respondents Norman and Angela Wong (Mr. and Mrs. Wong) in 2004. The Wongs subsequently experienced severe problems with the house, including mold and flooding, and in April 2007 demanded arbitration for "damages arising out of purchase of single-family residence" in accordance with the residential purchase agreement.

**Arbitrator's recitation of facts**

The arbitration was heard by Judge Michael D. Marcus (Ret.) (the arbitrator) through ADR Services, Inc., in October and November 2009 and May and June 2010. The arbitrator rendered an interim arbitration award in November 2010, and then, following a motion by the Kopelevs to reconsider the interim award, the arbitrator issued his final, 66-page award in September 2011. The final award summarized the facts as follows:

The house, which faced north, was situated at the bottom of a hill. A retaining wall was located in the backyard and, when the Kopelevs bought the house, steps ran from the top of the retaining wall up the hill to a concrete observation deck on the property. A series of man-made swales, running east to west, existed above the deck and

---

[1] Following the filing of the opening brief in this appeal, Dr. Kopelev passed away. For ease of reference, we refer to appellants in the plural in this opinion.

2

below a fire road to the south of the property. Those swales intersected with a north-south swale that ran to the fire road.

The city began work on a storm drain project in the area in approximately December 1986. The city informed the Kopelevs that a storm drain would be built across a portion of their property and represented that it would provide their house "with a great deal of protection from flooding." A letter from the city to the Kopelevs stated that the "concrete bench drain located in your back yard will no longer be needed and therefore, removed by the City. This operation will result in damage to your observation deck and stairs, all of which will be replaced with new concrete."

Mrs. Kopelev estimated that the city began working on their property in January 1987. She described the construction as extensive and testified that the swales on the property were destroyed.

The Kopelevs wrote to the city regarding concerns about erosion near their house resulting from the storm drain project, and the city responded in November 1987. The city's letter, written by the assistant city engineer, stated, "your home is not subject to any current or future potential structural damage which can be attributed to the construction of said storm drain. . . . I will further state that your property is no longer subject to a flood hazard, which was eliminated with the construction of this drain." The letter noted that it would be placed in the permanent file, ensuring "that if you should decide to sell your property at some time in the future, the potential buyers will have an opportunity to come in and review this letter for themselves."

Mrs. and Dr. Kopelev testified that the storm drain project caused significant defacement to their property, including destruction of the steps leading to the observation deck, and removal of the retaining wall, vegetation, and swales. Ms. Kopelev said the observation deck was "completely removed," while Dr. Kopelev never saw the deck removed.

The Kopelevs sued the city in November 1987 because of damage caused by the storm drain project. They complained that the city had breached its agreement to repair property damaged by the project, including replacement of the observation deck and

3

stairs. In March 1991, the suit was settled, with the city paying the Kopelevs a total of $120,000 for a release of all claims. Mrs. Kopelev testified in the arbitration that they used the money only to make repairs to the front of the house, and that work on the back of the house, including construction of the new observation deck and stairs, was completed by the city "at least three years" before the 1991 settlement.

The property currently has an observation deck, and the stairs leading up to it are located, in part, where a retaining wall used to stand. The arbitrator found that there was no verifiable date when the existing observation deck and stairs were built. Mrs. Kopelev testified that the deck and stairs were built at "the end of 1987" or "between 1988 and probably 1989 and 1990" but before the lawsuit against the city settled. She said that the deck and stairs were built by the city. She did not investigate whether the deck and stairs were built to code or were permitted. Dr. Kopelev testified that the observation deck was built "at least a couple of years" before the stairs. He said that the city built the deck but not the staircase. City records did not contain any permits for construction of the deck and stairs or removal of part of the retaining wall. An expert retained by the Wongs, using aerial photographs, opined that the deck and stairs were built in either 1992 or 1993. Mrs. Wong testified that she asked Mrs. Kopelev in November 2006 who built the deck and staircase, and Mrs. Kopelev told her that the Kopelevs had them built 15 to 17 years prior and no permit was required because they merely "improved" the property.

The Kopelevs decided to sell the house in 2004. According to Mrs. Kopelev, they originally listed the house for $1,795,000, relying on Mrs. Kopelev's experience as a real estate professional and investor, as well as comparable sales in the area. After switching agents, they reduced the listing price. The agent testified that the house was in very good condition when it was listed.

Mrs. Wong was attracted by the property's observation deck, location, and ocean view, and she thought it would be good for entertaining. The Wongs executed a residential purchase agreement in July 2004 to purchase the property for $1,408,000. The Kopelevs counter-offered, and the parties eventually agreed on a price.

4

The Kopelevs thereafter provided a real estate disclosure statement to the Wongs. Mrs. Kopelev, as a former licensed real estate broker, knew that the purpose of the disclosure statement was to inform the buyer of material information known by the seller at the time of sale. The disclosure statement read: "Buyers should have prof. inspection to satisfy themselves. Current owners lived here since 20 years ago and done remodeling then. May/may not have all permits." The statement, however, did not reference the storm drain project, the construction of the new deck and staircase, the modification of the retaining wall, or the Kopelevs' lawsuits against the city. Mrs. Kopelev testified that after escrow opened, she told Mrs. Wong "absolutely everything" about the storm drain project. She further testified she told Mrs. Wong that they had sued the city because of the storm drain project and removal of the deck and stairs.

Both Mr. and Mrs. Wong denied that anyone told them about the storm drain project, the destruction of the older deck and stairs, the building of a new deck and stairs, or the modification of the retaining wall. They also stated they were never advised of any problems with drainage issues. They hired a general building inspector, who inspected the property and did not alert them to any problems. He recommended a geological evaluation because the house is on a hillside, but he found no evidence of mold or water intrusion. In viewing the house numerous times before close of escrow, Mr. and Mrs. Wong never saw evidence of soil erosion, mold, or mildew.

The Wongs made a final inspection of the property and accepted its condition on September 30, 2004. They paid the Kopelevs $1,495,000 and received a $6,000 credit for minor repairs.

After the Wongs moved into the house they replaced all of the carpets and remodeled the kitchen and other parts of the house. There was no evidence of mold or water intrusion.

They first discovered water intrusion in February 2005 when they noticed wet carpet in the second floor bedroom and water on the bedroom wall. Mrs. Wong did not remove the pad under the carpet because she thought a fan would dry it. They removed the carpet about a year after it first became wet. Between August and November 2005,

5

the Wongs became aware of an increasing musty and moldy smell in the house.  A mold remediation company attempted to address the issues, but the back section of the house still tested positive for mold.

The Wongs wrote to the Kopelevs in October 2006, requesting that they pay for expenses to address the mold problem.  The Kopelevs met with the Wongs and the real estate agents at the house in November 2006.  Mrs. Kopelev noticed that the rear patio was overgrown with weeds, the observation deck was dirty, and the drainage system around the backyard pool was clogged.  She used a hose to demonstrate that the drain was blocked.  Up to the time of the Kopelevs' visit, the Wongs had not cleaned the drain.  Mrs. Kopelev testified that the Wongs had no interest in her explanations for the mold.

An expert retained by the Wongs testified that she tested the house for the presence of spores.  Rooms in the house that directly abutted soil had "fantastically high" levels of spores, higher than any the expert had previously observed.  She opined that remediation of the mold could not begin until water intrusion stopped.

Another expert retained by the Wongs testified that a four-inch drain in the backyard was inadequate to handle water runoff.  He further testified that the deck and stairs, which are impervious, substantially increased the volume of water that flowed down the slope and stairs toward the back patio and the house.  The Kopelevs challenged the expert's calculations, contending that he used the wrong measure to calculate water runoff.

A third expert retained by the Wongs opined that the deck and nearby four-inch drain did not adequately collect runoff.  Runoff flowed uncontrolled down-slope to the rear yard area, and water discharged onto the backyard stairs flowed onto the back patio.  The expert tested the soil abutting the house and found it to be wet to saturated, even though the area was experiencing drought conditions at the time.  The expert also testified that the observation deck and adjoining stairs were not properly secured and could potentially fail; another expert retained by the Wongs testified similarly.

An expert retained by the Kopelevs found several possible explanations for the water intrusion into the house.  These included:  heavy rains that might have overloaded

6

the backyard drain; a possible loosened or cracked drainage system; blockage of drainage; possible damage to plumbing from the kitchen remodel; and blockage of rain gutters.

Another expert retained by the Kopelevs observed no major cracking or offsets on the observation deck and stairs, which to him indicated their stability. He opined that the stairs, which he assumed were cut into the retaining wall, did not cause the retaining wall to fail. Additionally, he testified that the kitchen and bath remodel, along with deterioration of cast iron sewage piping, could have caused the water intrusion into the house.

**Arbitrator's findings of liability**

The Wongs contended that the Kopelevs fraudulently concealed materials flaws with the property.

In his final award, the arbitrator initially noted that Mrs. Kopelev, who was the primary witness on the Kopelevs' side and who was most involved in the sale of the property, was not credible. The arbitrator found that she was repeatedly unresponsive to questions; she had selective recall of important events; she was inconsistent about when the deck and stairs were built; she dubiously claimed that neither she nor her husband signed the disclosure statement provided to the Wongs in connection with the sale; her husband testified that the stairs were built two years after the observation deck, contradicting her testimony; and she improbably testified that she did not disclose the storm drain project in the disclosure statement because there was no room in the statement to do so.

The arbitrator found that the Kopelevs knew that they had an obligation to advise the Wongs in writing of all facts known to the Kopelevs that would materially affect the property, but they did not disclose the storm drain project. They also failed to disclose their litigation with the city, which was material because the Kopelevs had concerns that the city damaged their property. Additionally, the arbitrator found that the Kopelevs had the newer observation deck and stairs built without permits, a fact that materially affected the value of the property. Moreover, the arbitrator found that in building the stairs to the

7

deck, the Kopelevs breached the retaining wall and built a new retaining wall to the west of the stairs without a permit.

The arbitrator determined that if the Wongs had known about the unpermitted deck, stairs, and retaining wall, they would not have bought the house if repairs of those features cost more than $200,000. The primary issue, however, was what caused the water intrusion and mold. The arbitrator found that there was a variety of causes: the four-inch drain became ineffective due to surrounding erosion; the 2004 and 2005 rains were unusually heavy; and the Wongs failed to properly maintain the roof gutters and drain on the retaining wall. Given these conditions, the arbitrator concluded: "the impervious nature of the concrete deck and stairs played a major part in causing rain water to penetrate the exterior walls of the house."

The Wongs were forced to hire people to remediate the mold and determine its cause, and also to explore the safety of the hillside, observation deck, and stairs. The Wongs bought the house, in part, to entertain, but because of the mold were unable to do so. Thus, the arbitrator determined that the Wongs were harmed by the Kopelevs' concealment of material facts.

The arbitrator found that the Wongs had suffered "loss of use" damages of $100,000, predicated on their inability to entertain, to use the deck, or to use more than half of the house due to mold. The arbitrator originally determined this amount to be $125,000, based in part on the Kopelevs' purported removal of a swale, but he decreased the amount to $100,000 after the Kopelevs' motion for reconsideration, which pointed out the lack of evidence that they had removed a swale. He found that some, but not all, of the runoff that caused the mold was a product of the impervious deck and stairs and the breached retaining wall.

In addition, the arbitrator found that the observation deck, adjoining stairs, and retaining wall would need to be reinforced. Further, the pool deck below the retaining wall would need to be repaired after being inundated by runoff for years, and the mold issues would require remediation. The costs of repairs would be $183,888.

The arbitrator found that the fair market value of the property on the date of sale to the Wongs was $1,475,000, less $183,888 for cost of repairs and $100,000 for loss of use. The arbitrator deducted $50,000 from the damages amount, however, based on the Wongs' failure to mitigate damages by building a swale. He also deducted $25,000 to reflect the Wongs' conduct in exacerbating the wet walls and mold by allowing drains and gutters to clog. Altogether, the Wongs' damages totaled $208,888.

As the prevailing parties, the Wongs were entitled to a contractual fees award. They requested over $1.2 million in fees and costs. The arbitrator instead awarded fees of $461,378.27 and costs of $79,974.16.

**Confirmation of the arbitration award**

After the arbitrator issued the final award, the Kopelevs filed with him a request for clarification of the award, asserting that it contained numerous errors. The arbitrator denied the request in full.

In October 2011, the Wongs filed a petition to confirm the arbitration award. In December 2011, the Kopelevs filed a response to the petition and a request to vacate or correct the award.

The trial court heard the matter in January 2012. It confirmed the award, denying the Kopelevs' request to vacate or correct the award. Judgment was entered in February 2012.

The Kopelevs timely appealed.

## DISCUSSION

The Kopelevs contend that the arbitration award must be vacated because the arbitrator committed numerous errors and acted improperly in rendering the award. The Kopelevs face a high hurdle in making such an argument, as arbitrators are afforded great deference under California law.

We review a trial court's order confirming an arbitration award de novo. (*Cotchett, Pitre & McCarthy v. Universal Paragon Corp.* (2010) 187 Cal.App.4th 1405, 1416 (*Cotchett*).) The Code of Civil Procedure provides limited bases to vacate an arbitration award: "the court shall vacate the award if the court determines any of the

9

following: [¶] (1) The award was procured by corruption, fraud or other undue means. [¶] (2) There was corruption in any of the arbitrators. [¶] (3) The rights of the party were substantially prejudiced by misconduct of a neutral arbitrator. [¶] (4) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted. [¶] (5) The rights of the party were substantially prejudiced by the refusal of the arbitrators to postpone the hearing upon sufficient cause being shown therefor or by the refusal of the arbitrators to hear evidence material to the controversy or by other conduct of the arbitrators contrary to the provisions of this title. [¶] (6) An arbitrator making the award [was subject to disqualification]." (Code Civ. Proc., § 1286.2.) This provision has been interpreted narrowly. "[A]n arbitrator's decision is not generally reviewable for errors of fact or law, whether or not such error appears on the face of the award and causes substantial injustice to the parties." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 6.) This is because "it is the general rule that parties to a private arbitration impliedly agree that the arbitrator's decision will be both binding and final." (*Id.* at p. 9.)

The Kopelevs contend that the arbitrator demonstrated partiality and exceeded his powers in numerous ways. A proposed arbitrator must disclose matters that "could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial." (Code Civ. Proc., § 1281.9, subd. (a).) An arbitrator exceeds his or her powers by issuing an award that violates a party's statutory rights or "an explicit legislative expression of public policy." (*Cotchett*, *supra*, 187 Cal.App.4th 1405, 1416.)

First, the Kopelevs argue that the arbitrator incorrectly found that Mrs. Kopelev's testimony was not credible based on the hearsay introduction of a criminal felony complaint brought against Mrs. Kopelev that was subsequently dismissed. The credibility of witnesses is a matter for the arbitrator to decide and does not provide a basis to vacate the award. (*Communications Workers v. General Telephone Co.* (1981) 127 Cal.App.3d 82, 87; *Nat'l Auto. & Casualty Ins. Co. v. Superior Court* (1986) 184 Cal.App.3d 948, 954.) Moreover, the arbitration award itself makes no mention of the

10

prior criminal proceedings. Instead, the arbitrator listed a number of reasons that he found Mrs. Kopelev to be not credible, including that she was repeatedly unresponsive to questions, had selective recall of important events, and testified improbably as to a number of issues. Speculation that the arbitrator may have had an unstated reason for his credibility determination does not provide a basis to vacate the award.

The Kopelevs also argue that the arbitrator exceeded his authority by relying on unproven theories of the Wongs, creating his own theories, and agreeing with testimony presented by the Wongs' experts that was contradicted by the evidence. They contend he demonstrated partiality by accepting hydrology-related testimony given by one of the Wongs' experts, concluding that the Kopelevs constructed the new deck and stairs, focusing on the lack of permits, ignoring the lack of any hillside erosion, disregarding the fact that the Wongs allowed a wet carpet to remain in the house for at least a year, and believing that the Wongs did not ask any questions about the drainage system prior to buying the house. Moreover, they claim he demonstrated partiality and exceeded his powers by refusing to consider the Kopelevs' criticisms of the hydrology-related testimony given by the Wongs' expert, refusing to consider the Kopelevs' testimony regarding the value of the property at the time of sale, finding the Wongs credible, disregarding the Kopelevs' testimony regarding their communications with the city, ignoring the Kopelevs' testimony about rainfall and a water test performed by Mrs. Kopelev, refusing to consider testimony by an independent witness that contradicted testimony by the Wongs' expert, disregarding the Kopelevs' testimony regarding their settlement with the city, failing to question why the Wongs did not request that the city construct a swale to mitigate runoff, and failing to consider the Wongs' financial motivations in suing the Kopelevs.

There are several problems with the Kopelevs' arguments. One is that the record does not contain the testimonial or documentary evidence underlying many of the arbitrator's conclusions, which would prevent us from finding the conclusions erroneous, were that the proper standard of review. This leads to another problem with the Kopelevs' brief—they ask us to find that the arbitrator erred in determining the facts, but

11

determination of historical facts is strictly within the province of the arbitrator and is not something that we can overturn. (*Cotchett, supra*, 187 Cal.App.4th 1405, 1416.) Thus, even if a complete record were presented, we would have no basis to vacate the award. Furthermore, the Kopelevs do not explain how any of the arbitrator's determinations violated statutory rights or "an explicit legislative expression of public policy," necessary predicates to a finding that the arbitrator exceeded his powers. (*Ibid*.) Moreover, to the extent that the Kopelevs contend the arbitrator refused to hear material evidence, they are mistaken. "An arbitrator 'hears' evidence by providing a 'legal hearing,' that is, by affording an 'opportunity to . . . present one's side of a case.'" (*Schlessinger v. Rosenfeld, Meyer & Susman* (1995) 40 Cal.App.4th 1096, 1105.) The arbitrator clearly afforded the Kopelevs the opportunity to present their case. As noted by the Kopelevs, the arbitration lasted for weeks, and the voluminous final award amply summarizes both sides' versions of events and expert testimony. Simply because the arbitrator chose to believe certain testimony presented by the Wongs to the detriment of the Kopelevs does not mean he impermissibly refused to hear material evidence.

One factual determination with which the Kopelevs take particular issue is the arbitrator's finding that they had the new observation deck and stairs built. The Kopelevs contend that the structures were built by the city, and argue there was no evidence to the contrary. Unfortunately for the Kopelevs, this contention is largely irrelevant. Inherent in the arbitrator's power to decide historical facts "is the possibility the arbitrator may make legal or factual errors." (*Cotchett, supra,* 187 Cal.App.4th 1405, 1416.) We may not vacate the award because of factual errors. (*Moncharsh v. Heily & Blase*, *supra*, 3 Cal.4th 1, 6.) In any event, substantial evidence supports the arbitrator's finding. As found by the arbitrator, the new deck and stairs had not been built prior to the lawsuit against the city, and it is improbable that the city would undertake such construction during ongoing litigation, especially with no waiver, indemnity, or other writing to document such work. Further, the Kopelevs received $120,000 from the city when the litigation was settled, which leads to a credible inference that the Kopelevs used the money to construct the deck and stairs. No permit was on file for the construction, which

12

also supports the conclusion that the Kopelevs had the work done without a permit. And the Wongs testified that the Kopelevs told them in 2006 that they had built the deck and stairs.

The Kopelevs also argue that the arbitrator awarded improper damages. They contend that the arbitrator was not entitled to award "loss of use damages" because the Wongs did not try the case on a loss of use damage theory and did not introduce any evidence to support loss of use damages. This argument also fails. An arbitration provision such as the one here, which requires the arbitrator to render an award in accordance with California substantive law, does not mandate review of the award on its merits, including whether the arbitrator awarded the wrong type of damages. (*Gravillis v. Coldwell Banker Residential Brokerage Co.* (2010) 182 Cal.App.4th 503, 519; *Shahinian v. Cedars-Sinai Medical Center* (2011) 194 Cal.App.4th 987, 1001.) Furthermore, from the record presented, no error is apparent. The arbitration award discussed numerous ways in which the Wongs presented loss of use damages—they were unable to entertain, to use the deck due to fear of its failing, or to use more than half of the house due to mold. Loss of use damages are specifically available to a person defrauded in the purchase of property. (Civ. Code, § 3343, subd. (a)(2).) And the record does not establish that the Wongs failed to seek loss of use damages.

The Kopelevs further contend that the Wongs did not suffer damages because they did not pay more for the property than it was worth. In this regard, they argue that the arbitrator should have agreed with Mrs. Kopelev's testimony that the property at the time of sale was worth several hundred thousand dollars more than the Wongs actually paid. Again, the Kopelevs ask us to second-guess a factual determination made by the arbitrator, something we may not do. (*Cotchett, supra*, 187 Cal.App.4th 1405, 1416.) Regardless, the trial court had ample reason to find that the Wongs suffered damages. The actual sale price was obvious evidence of the property's value. Additionally, the Kopelevs originally listed the property for much more, and reduced the sale price when they were unable to find a buyer. The Wongs argued to the arbitrator that the property had *no* value because of the mold and other problems, but the arbitrator rejected their

13

argument, as well, instead finding that the property had a significant value but suffered from defects requiring remediation and resulting in loss of use.

In sum, the record reveals no error committed by the arbitrator that would allow us to vacate the award.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


                                            BOREN, P.J.

We concur:


        ASHMANN-GERST, J.


        FERNS, J.*

_____

\*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.