Filed 11/10/15  Zephyr Equities & Development, LLC v. Brookfield Natomas, LLC CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ZEPHYR EQUITIES & DEVELOPMENT, LLC,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>BROOKFIELD NATOMAS, LLC,<br><br>    Defendant and Appellant. | G050001<br><br>(Super. Ct. No. 30-2013-00648089)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, Charles Margines, Judge, and Ronald L. Bauer, Judge.  Reversed.

        Donna Bader for Plaintiff and Appellant.

        Corbett, Steelman & Specter, Bruce R. Corbett, Laura M. Mascheroni, Susan J. Ormsby, and Adam G. Wentland for Defendant and Appellant.

We have for our consideration two appeals challenging the trial court's order confirming and modifying an arbitration award. The dispute concerns a consulting agreement between a real estate developer and Steven P. Rosenblatt (Rosenblatt), the sole owner of Zephyr Equities & Development, LLC (Zephyr). On appeal, the real estate developer asserts the trial court erred in refusing to vacate an arbitration award based on evidence it enforced an illegal contract and the illegal provisions were not severable. Alternatively, it asserts the award should be reduced because the trial court miscalculated the portion attributable to the legal provisions. In its cross-appeal, Zephyr maintains the trial court should not disturb the arbitrator's determination the contract was legal and the court erred in reducing the arbitrator's award.

In summary, the issues raised by the parties in these two appeals are whether (1) the arbitration award is immune to judicial review; (2) the parties' consulting agreement required Zephyr to perform activities that required a real estate license it did not possess; (3) if yes, were these illegal activities severable to permit Zephyr to be compensated for the legal work it performed; and (4) if Zephyr is owed compensation, did the court correctly reduce the arbitration award based on the evidence presented. We conclude the arbitration award was subject to judicial review and, after independently reviewing the issue, we conclude the consulting agreement did not require Zephyr to perform activities that required a real estate license. Consequently, the arbitration award is not the enforcement of an illegal contract and must be confirmed without modification. We reverse the trial court's ruling confirming but modifying the arbitration award and direct the trial court to enter a new order confirming the award without modification. Based on this ruling, we need not address the contention the court's calculations modifying the award were incorrect.

2

# I

## A. Background Facts

Brookfield Natomas, LLC (Natomas) is a subsidiary of Brookfield Land Company, Inc., (BLC), a California corporation, which is a subsidiary of the Canadian company, Brookfield Homes (these three related entities will collectively be referred to in the singular as BLC or Brookfield unless the context requires otherwise). BLC operates several large residential community development subsidiaries, each named after a particular real estate development. Natomas was formed and named for a multi-unit residential community near Sacramento, California.

Since 1997, BLC and Zephyr have worked together on several land development projects. Rosenblatt, the sole owner of Zephyr, worked closely with BLC's chief executive officer John Stewart.

In 2001 BLC started the Natomas project in Sacramento and hired attorney, Karen Diepenbrock, to draft agreements with several farmers (Landowners) in the area (the Landowner Agreements). Diepenbrock testified these agreements were not purchase and sale agreements. Rather, BLC received the Landowner's permission to obtain whatever entitlements would be necessary to later develop the Landowner's property, increasing its sale value. Most of the Landowner Agreements were signed in September 2002.

In January 2003, BLC hired Rosenblatt (owner of Zephyr) to work as a consultant on the Natomas project. In 2008 BLC stopped paying the consulting fee, but Zephyr continued to work on the project until 2011, when Zephyr demanded payment and then commenced the underlying arbitration proceedings.

## B. The Consulting Agreement with Zephyr

On January 27, 2003, Stewart (on behalf of BLC) and Rosenblatt (on behalf of Zephyr) executed a "Consulting Agreement" (the Agreement). The Agreement contained the following "RECITALS": (1) BLC "has executed or is in the process of

executing Landowner Agreements with all of the landowners in the Project Area" in Sacramento; (2) "A list of the present and potential Landowners and the number of acres owned by each within the Project Area and subject to a Landowner Agreement" is attached as exhibit A; (3) "A copy of a Generic Landowner Agreement already executed or to be executed by [BLC] with all the Landowners in the Project Area" is attached as exhibit B; (4) BLC desires to hire Zephyr (referred to as "consultant" throughout the Agreement) "to render business advice, development and marketing expertise and other services in furtherance of the Project as hereinafter specified."

Zephyr agreed to provide the following ten "Specific Duties": (1) "Assistance in securing Landowner Agreements with Landowners within the Project Area"; (2) "Assistance in securing such other lands as may be required to satisfy open space, habitat or other Project needs"; (3) "Assistance in pursuit of City or County development rights ('Entitlements') as to Project Land, including annexation to . . . Sacramento and satisfaction of the requirements" of all governmental agencies having jurisdiction; (4) "Assistance in budgeting the financial requirements for the development of Project Land as described in the Generic Landowner Agreement; provided, however, that the Consultant shall have no obligation to provide any funds to meet such requirements excepting the need to advance such minor costs as may have time to time be needed . . ."; (5) "[M]onitoring and coordinating the work of other consultants and experts engaged by [BLC]"; (6) "[P]reparing or processing the Project Master Plan and all environmental documents pertinent thereto"; (7) "[M]arketing the Project Land including active oversight of the activities of the realtors involved"; (8) "Coordinating and attending all meetings of Landowners, governmental entities, consultants, and other as may from time to time be necessary or appropriate in pursuit of the Project"; (9) "Assistance in connection with any eminent domain proceedings"; and (10) "Completion of such other work or assignments as may from time to time be made by [BLC] in furtherance of the Project."

4

In the Agreement, BLC agreed to be responsible for the following: (1) paying Zephyr; (2) "Proceeding with the assembly of the Project Land and such other land in or around the Project area as may be necessary . . . to provide such habitat and open space as may be necessary to obtain the Entitlements"; (3) funding the project "to the extent set forth in the Generic Landowner Agreement"; (4) providing an office, supplies, and necessary equipment; (5) hiring an attorney to represent BLC "and provide such legal and development advice, coordination, and other services" deemed necessary; (6) providing a project engineer and land planner to represent BLC "and provide engineering, land and development advice, coordination, and other services" deemed necessary; and (7) provide services to process receipts, financial disbursements, and any other supervision or support deemed necessary.

The Agreement promised to pay Zephyr a consultant fee of $15,000 per month plus a bonus. The bonus was described as being for "services performed prior to and during the term of this Agreement." The Agreement provided, "Consultant shall receive a bonus in the amount of [f]our percent (4%) percent of the Gross Proceeds of each sale of Project Land actually sold by [BLC] for itself or for the account of any one or more of the Landowners in the Project Area. 'Gross Proceeds' shall mean the actual purchase price set forth in the final closing statement issued by the escrow holder, and all other costs, less commissions, cost of surveys, closing costs and all other costs, as set forth in [s]ection 10.2 (b) of the Generic Landowner Agreement. While this bonus shall be deducted as an expense of sale before distribution of proceeds to [BLC] and Landowners, it shall not be included for purposes of calculating the bonus . . . ." The parties agreed the obligation to pay the bonus would survive termination of the Agreement and "shall continue until all Project land is sold or until all Landowner Agreements have terminated." (Emphasis omitted.) And finally, the Agreement provided Zephyr would not receive a bonus "on the sale of land where the sales price per acre is less than [$20,000] per acre."

5

The Agreement clarified Zephyr was an independent contractor and "shall not solicit or receive any real estate commissions or other compensation directly or indirectly from [BLC] or any Landowner or other third party in connection with the Project or any Project Land." The Agreement contained an arbitration provision and a "severability" clause. "If any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision thereof and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein."

Exhibit A of the Agreement stated there were 10 Landowners (having a combined total of 2,109 acres) who had already signed Landowner Agreements with BLC. There were two "pending agreements." The first was with an individual landowner owning 105 acres. It was noted there was an agreement for right of first refusal pending. The second pending Landowner Agreement was with a corporation owning 499 acres. It was noted "negotiations are in progress" and there would be no compensation for land "used to mitigate for development on land owned by [the corporation] outside of the Project Area."

The following month, on February 3, 2004, BLC assigned its rights under the Agreement to its subsidiary Natomas. In the same agreement, BLC assigned its rights under its consulting agreement with DeArmon Company LLC to Natomas. As noted earlier, for the sake of clarity and to avoid confusion we will refer to BLC and its subsidiary Natomas collectively and in the singular as BLC or Brookfield, unless the context of the discussion requires otherwise.

6

*C. Relevant Terms of the Landowner Agreement*

Section 1.7 of the Landowner Agreement provided the following definition: "Landowner Agreement shall mean an agreement between [BLC] and a landowner in the Project Area which transfers such landowner's development rights to [BLC]. Each Landowner Agreement shall contain terms and conditions similar to this Agreement and such other provisions as may be unique to such Landowner." The parties agreed the "Term" of the agreement would be ten years.

Article 2, titled "TRANSFER OF DEVELOPMENT RIGHTS" contained the following relevant provisions: Section 2.1 stated, "The purpose of this Agreement is to enlist the services, expertise and financial resources of [BLC], for the joint benefit of Landowner and [BLC], to obtain the necessary entitlements to develop and market the Project Land to its highest and best use as that use may from time to time be determined by [BLC] in its sole discretion. To that end and for the consideration described in Article 3 hereof and subject to the other terms and conditions set forth in this Agreement, Landowner hereby conveys to [BLC] all of Landowner's development rights in the Land during the Term. The term 'development rights' shall mean each and every right a landowner has or may have to use the Land for any commercial purpose, including such uses as residences, offices, shopping centers, parks, schools, libraries, farming, habitat mitigation, drainage basins and other drainage improvements, roadways and other infrastructure, together with the right to convey the Land during the Term and the right to encumber the Land in furtherance of obtaining development entitlements by causing it to be subject to development agreements of various kinds, such as, by way of example but not limitation, habitat conservation plans, drainage districts and financing plans providing funding for improvements serving the Land. The foregoing notwithstanding, Landowner shall have the right to continue to farm the Land and receive the consideration therefor as more particularly set forth in Section 6.1 hereof. In return for such conveyance, and for the additional consideration described in Article 3 hereof, [BLC] agrees to pursue

7

development entitlements for the Land and the Project Land, and to advance up to Four Million Five Hundred Thousand Dollars ($4,500,000) for such purpose over the Term as more fully set forth in Section 3.1 hereof."

Article 3, titled "CONSIDERATION" contained several relevant provisions. Section 3.1, stated, "Development Funding. Subject to the other terms and conditions hereof, in consideration of the promises and covenants of Landowner, hereunder, [BLC] agrees during the Term to advance" up to $4.5 million to obtain development entitlements.

Section 3.3 provided [BLC] shall act as the landowner's attorney-in-fact on all matters related to obtaining development entitlements and all matters relating to the marketing and sale of the land. Specifically [BLC] was given the exclusive right in its role of attorney-in-fact to (1) decide when to sell the land, (2) to negotiate a purchase price for the Land, and (3) execute the agreement for purchase and sale, brokerage agreement and other necessary agreements relative to the sale. BLC agreed to consult with the Landowners before offering the land for sale and the parties agreed all sale proceeds would be allocated and paid as specified in Article 10.

Article 4, titled "DEVELOPMENT" outlined the responsibilities of each party. BLC promised to "consult regularly with Landowners" and be "solely responsible for organizing and pursuing the development efforts to obtain entitlements for the land." "As more particularly set forth in section 4.6 hereof, [BLC] shall have the full authority to act on behalf of the Landowner for purposes related to the development effort; however, any contracts for services such as engineering, project management, legal advice, environmental expertise, public relations advice, and similar services . . . shall be made by and for the account of BLC and not Landowner."

Section 4.6 contained the provision creating an attorney-in-fact relationship between BLC and the Landowner. "Landowner hereby appoints [BLC] as its attorney-in-fact as to all matters relative to obtaining development entitlements for the Land and all

8

matters relative to the marketing and sale of the Land (except as otherwise limited by this Agreement), to include the right to enter into agreements on behalf of the Landowner with the City, the County, the District, [etc.]"

And finally section 10.1 described how the land would be sold. "As soon as development entitlements for the Project Area have been secured or at such earlier time as the likelihood of development entitlements being secured is sufficiently certain, in the sole judgment of [BLC], as to yield a price not materially less than if the Land were fully entitled, [BLC] shall have the right to market the Land for sale. Landowner shall fully cooperate with [BLC] in the marketing process including execution of documents as provided in Section 4.5 hereof. Both Landowner and [BLC] shall have the right to consummate the sale of their interests in the Land by way of an Internal Revenue Code Section 1031 exchange (simultaneous or delayed) . . . . For purposes of this provision, 'development entitlements' shall mean the following: rezoning; adoption of a community plan, financing plan and habitat conservation plan; approval of general plan amendments; approval of tentative large lot subdivision map; and such other approvals as are reasonably necessary prior to issuance of a grading permit on the Land."

Section 10.2 stated the proceeds of the sale would be disbursed by the escrow holder in the following order: (1) all expenses including brokerage commissions and closing costs; (2) $15,000 per gross acre to Landowner; (3) a management fee of 4 and 1/4 percent of the purchase price of the land and a pro rata share of all money BLC advanced; (4) 60 percent of the balance of the sale proceeds to the Landowner; and (5) 40 percent of the balance of the sale proceeds BLC.

D. *The Arbitration Award*

In March 2011, Zephyr made a demand for arbitration, alleging breach of contract, after BLC stopped paying the $15,000 monthly consulting fee. In its defense, BLC asserted the Agreement was terminated in 2008 and the bonus provision was illegal and unenforceable.

9

The arbitrator (Retired Judge Ann Kough) issued an arbitration award in favor of Zephyr, ordering BLC to pay $519,000 for past due monthly payments. In addition, the arbitrator determined the bonus provision of the Agreement was enforceable.

The arbitrator made several factual findings about the relationship between the parties and their prior history working together. "Rosenblatt, who holds a [bachelor of science] in economics and a [m]aster's degree in urban planning, has a background in real estate management and development. He previously held a real estate license . . . in Colorado, where he worked managing and developing properties; he has never held a California real estate license. In the late 1980s . . . Rosenblatt moved to California and began looking for properties to acquire, rezone, and sell. His first such project was in Riverside County, where he met . . . Stewart . . . . The two men became friendly and met regularly to discuss the market and their various projects. [Rosenblatt] became aware that [BLC] did development similar to the type of development he himself did but also had a residential home building unit. [Rosenblatt and Stewart] discussed doing a joint venture in Placer County; that project did not work out. [Stewart] ultimately asked Rosenblatt if he would be interested in consulting for [BLC]; [BLC] wanted to do projects in the Sacramento area and . . . Rosenblatt was knowledgeable about development in that region. [Rosenblatt] agreed and began consulting for [BLC] on what became known as the Sunset or Amaruso project."

The arbitrator discussed the compensation history. "At first . . . Rosenblatt performed his consulting work without a written contract; he was paid on first an hourly, then a monthly basis. Eventually . . . Rosenblatt and [BLC] executed a written agreement covering the work [he] was doing on various [BLC] projects; that agreement provided for . . . Rosenblatt to receive a percentage of the gross proceeds of the projects plus various bonuses as the project progressed. [Rosenblatt] testified that it was . . . Stewart who suggested the percentage bonus rather than a joint venture or partnership. Originally the

10

contract was between . . . Rosenblatt individually and [BLC] but it was later changed to show Zephyr as the consultant. As [BLC] expanded its development in the Sacramento area, it created separate entities for each project; in turn, new consulting agreements with Zephyr, containing essentially the same terms, were drafted for each project. In 2001 . . . Rosenblatt opened [BLC's] Sacramento office; . . . [He] was given business cards by [BLC] which included his name, the [BLC] logo and [BLC's] address."

For the sake of comparison, the arbitrator discussed in detail the nature of a prior consulting agreement the parties executed. This agreement covered all of [BLC's] projects and provided Rosenblatt was to provide the following services: "[C]oordinate the planning design approval of entitlements and placement of improvements with utilities, subcontractors, public agencies and project engineers; representing [BLC] with the project general contractor to coordinate all phases of construction; attend planning, engineering, construction and scheduling meetings; provide [BLC] with professional advice, opinions and ideas on all acquisition development and construction aspects of each project, and maintain budgets and schedules for each project; submitting progress reports to [BLC] as requested." The arbitrator concluded Rosenblatt "was to essentially act as project manager for each project."

With respect to the project at issue in the arbitration (the Natomas project), the arbitrator made the following factual findings: "Rosenblatt and his team found the property in 2001. Alan Vail, who had an engineering background, introduced . . . Rosenblatt to Cameron Doyel, who represented the Natomas landowners. [Doyel] had been trying to obtain entitlements for the land but was unable to do so. Because of this [Doyel] was interested in working with [BLC] on developing the property. [Diepenbrock], a real estate and land use attorney, was hired to represent [BLC] in the acquisition and development of the property; [Rosenblatt] was to be [BLC's] liaison with the . . . landowners."

11

The arbitrator determined, "Rosenblatt negotiated the acquisition of the development rights to the Natomas property, in that he testified that he discussed [BLC's] position on various deal points with [Doyel] and the . . . landowners; the actual deal points came from . . . Stewart, who was in charge of the [BLC] Sacramento office at the time. [BLC] was not interested in purchasing the property outright, but instead wanted to enter into a land management agreement in which [BLC] would obtain the entitlements and develop the project with the landowners participating in the ultimate profits of any sale. [Rosenblatt] met directly with various landowners to explain what was involved in obtaining the entitlements and why [BLC] was the best entity to develop the project. This process took a year or more and, along with his work on the Amoruso project, became a full time job for . . . Rosenblatt."

The arbitrator then outlined the terms of the Agreement signed by the parties on January 27, 2003, reciting the same terms we recited at length earlier in this opinion (and therefore we need not repeat them). Next, the arbitrator discussed her factual findings regarding how the business relationship between Rosenblatt and BLC soured.

It began in 2004 when Stewart was transferred to BLC's Southern California Projects and was replaced by Richard Whitney and John Norman. Before leaving, Stewart failed to sign several modifications to "various consulting agreements between Zephyr and [BLC]" prepared by Diepenbrock. Rosenblatt sent copies of the agreement modifications to Whitney and Norman for their signature. During this time Zephyr continued to be paid $15,000 per month and was reimbursed for expenses.

The following year, a portion of one of BLC's Sacramento projects (called the Lincoln project) was sold. This was the first sale of one of BLC's Sacramento projects and BLC had not signed a consulting agreement with Rosenblatt/Zephyr regarding this project. Nevertheless, BLC paid Zephyr four percent of the gross proceeds as a bonus. Thereafter, Rosenblatt met several times with Ian Cockwell, BLC's chairman

12

of the board. Cockwell attempted to renegotiate the terms of various consulting agreements (including the Agreement at issue in this appeal) because he was unhappy with the terms of the bonus and believed it should be based on net proceeds. Cockwell understood the contract specified gross proceeds, but pressured Rosenblatt to agree to modifying the contract and accept four percent of net proceeds. During this time, Whitney and Cockwell told Stewart the bonus term was unacceptable because it was too expensive for BLC. Stewart said he did not include the term in future contracts. The arbitrator determined the "renegotiation discussions did not lead to any changes in the Agreement and the subject was eventually dropped. [Rosenblatt] continued to perform his duties on the [BLC] projects."

The arbitrator concluded that after the real estate market slowed down in early 2005, BLC's development projects were impacted by 2007. BLC stopped paying Zephyr $15,000 a month. Whitney testified he telephoned Rosenblatt to tell him in August 2008 that due to financial difficulties BLC had to terminate the monthly consulting fee. However, Rosenblatt testified he never received this telephone call or any indication he was being fired or the Agreement was being terminated. Rosenblatt contacted BLC's accounting office to find out why he was no longer being paid and "he never got a satisfactory response." Rosenblatt admitted he did not ask Whitney, Norman, or any other BLC executive about his monthly compensation because he believed BLC would eventually pay him and he was afraid Cockwell would terminate Zephyr if he "became too aggressive about the payments." Rosenblatt continued his work as a consultant on BLC's projects, including the Natomas project. He participated in meetings regarding the Natomas project and no one from BLC ever indicated he should not be present because the consulting contract was terminated.

This arrangement continued until early 2011, when Rosenblatt sent Whitney a letter asking him for payment of the agreed upon $15,000 monthly consultant

13

fee. Rosenblatt/Zephyr commenced arbitration after Whitney failed to reply. In the arbitration proceedings, BLC maintained it terminated the Agreement in 2008.

The arbitrator discussed and summarized the testimony of several non-percipient witnesses. She stated the witnesses included Richard Packard, a real estate developer, Carol McDermott, a certified planner and entitlement consultant, Tom Gibson, a real estate broker and development consultant, and Damon Gascon, a land use entitlement and development consultant. The arbitrator concluded these witnesses all testified about the "development process" but "with the exception of . . . Gibson, . . . none of these witnesses had sufficient qualifications to offer an expert opinion as to whether the type of work . . . Rosenblatt did on the Natomas project required a real estate license."

The arbitrator summarized the testimony about the development process as follows: "They all agreed that under the Agreement Zephyr was to perform services more in keeping with a project manager rather than simply an entitlement consultant; they also agreed that entitlement consultants do not generally have real estate licenses. [T]he witnesses testified that consultant could work for hourly rates, fixed fees, or monthly fees and that sometimes are entitled to bonuses or success fees. None of the witnesses, including . . . Gibson, had ever dealt with a project involving a [L]andowner [A]greement, such as the ones [used] for the Natomas project."

The arbitrator briefly discussed Gibson's opinion testimony. She summarized his opinion as follows: "Gibson, who had been involved in land purchases and development rights and had acted as a compliance officer in his prior real estate companies, opined that a consulting agreement which involves the purchase of any interest in real property requires a real estate license. It was his opinion that the negotiation of the [Landowner Agreements] for the Natomas project required a license, unless the negotiation was done by a [BLC] principal."

Turning to the legal issues, the arbitrator concluded the Agreement was valid and enforceable. She noted the Agreement was executed in 2003 and the parties

14

"acted in conformity with" it until 2008. She rejected BLC's argument the entire Agreement was unenforceable because it was "simply a disguised brokerage agreement and . . . Stewart, [BLC's] CEO, did not have the authority to enter into the Agreement with the bonus terms contained therein."

The arbitrator concluded, "Assuming *arguendo* that Zephyr was required to hold a real estate license in connection with the work . . . Rosenblatt did to obtain the Landowner Agreements, an issue discussed below, that does not make the entire contract against public policy or unenforceable." The arbitrator determined an illegality collateral to the main purpose of an agreement may be severed. She ruled the main purpose of the Agreement was stated in Recital C "('[BLC] desires to engage the services of [a] Consultant to render business advice, development and marketing expertise and other services in furtherance of the Project . . .') and section 2.2, which sets forth Zephyr's specific duties, none of which on their face require a real estate license." The arbitrator concluded that if Rosenblatt went beyond the requirements of the Agreement to perform acts requiring a license, this fact does not preclude him from recovering for services not requiring a license. She also concluded Stewart had authority to enter into the Agreement on behalf of BLC (for reasons we need not repeat since they are not relevant to the issues raised on appeal).

Having determined the contract was enforceable, the arbitrator next determined the issue of whether Whitney's alleged conversation with Rosenblatt in 2008 terminated the Agreement. She noted the Agreement provided any termination required 30 days' written notice. Moreover, "[T]he actions of all of the individuals involved are not consistent with a termination of the Agreement. [Whitney] told no one at [BLC] that the Zephyr agreement had been terminated and [BLC's] officers and employees continued to interact with . . . Rosenblatt as if no termination had occurred. [Norman], while aware at some point that payments to Zephyr had ceased, continued to consult . . .

15

Rosenblatt on issues concerning the Natomas project as they arose and continued to have him included in landowner meetings."

The arbitrator found troubling Rosenblatt's failure to confront BLC about the lack of payments for three years, but also found credible Rosenblatt's explanation he assumed he would eventually get paid and he did not want to cause Cockwell to terminate the Agreement. The arbitrator found it significant that Whitney testified he told Rosenblatt the monthly payments would cease, not that the Agreement was being terminated.

Turning to Rosenblatt's request for declaratory relief regarding the bonus, the arbitrator rejected BLC's argument the issue was premature because the Natomas project was not finished. She was also not persuaded by BLC's argument the Agreement "is a disguised real estate commission" that required Zephyr to have a real estate license. She explained the 10 duties set forth in section 2.2 do not require a real estate license. The arbitrator acknowledged section 2.1.1 required Zephyr to assist in securing Landowner Agreements, however, the term "assistance" was not defined in the Agreement. "[G]enerically assistance does not necessarily require a license. The relevant portion of Business [and] Professions Code section 10131 requires a license if the individual 'performs one or more of the following acts for another or others,' including 'sells, or offers to sell, buy or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listing of, or negotiated the purchase, sale[,] or exchange of real property or a business opportunity.' Whether the actual acts performed by . . . Rosenblatt fit within this definition will be discussed below, but 'assisting' in securing landowner agreements for development rights or securing other lands for open space purposes does not necessarily implicate the section."[1]

_____

[1] All further statutory references are to the Business and Professions Code, unless otherwise indicated.

16

Citing to Civil Code section 3541, the arbitrator stated contracts must be "interpreted so as to be lawful and operative if such an interpretation can be done without violating the intent of the parties." The arbitrator concluded the parties did not intend for Rosenblatt/Zephyr to hold a particular license. It is undisputed BLC was aware Rosenblatt did not have a real estate license or that they believed one was necessary under the terms of the Agreement. Rather, the Agreement prohibits Zephyr from receiving real estate commissions in connection with the project and the bonus defines "[g]ross [p]roceeds" as being the purchase price less commissions. The court concluded a "consultant may 'assist' in securing land agreement or land without necessarily soliciting prospective sellers or negotiating the purchase of real property or a business opportunity. And finally, the court focused on evidence all the Landowner Agreements were in place before the Agreement with Zephyr was executed rendering irrelevant the ongoing duties outlined in section 2.2.

The Arbitrator stated there was no legal or factual support for BLC's theory the bonus was a disguised commission because it was tied to the sale of real property. She explained, "Any number of the witnesses testified that bonuses in general are common in development projects, although they are typical[y] based on net proceeds rather than gross proceeds; [Packard] testified that he had seen language in agreements where the bonus survived the termination of the agreement. [Diepenbrock, BLC's attorney,] drafted the Agreement and verified the terms with . . . Stewart, who executed it; [BLC] cannot now claim, without any legal authority, that the Agreement its own attorney drafted and its own CEO executed is unenforceable because it somehow contained a disguised commission."

The last issue decided by the arbitrator, was whether one provision of the Agreement (section 4.2) was illegal because it provided that the bonus was for "'the services performed prior to and during'" the term of the Agreement. BLC argued several services performed prior to the Agreement required a real estate license, namely

17

Rosenblatt's assistance in obtaining Landowner Agreements, securing the open space agreements, and performing other services connected with the acquisition of property. The court determined the evidence and legal authority did not support this contention.

First, the arbitrator discussed the evidence presented regarding Rosenblatt's services prior to the term of the Agreement. She noted Rosenblatt's deposition testimony was different from his testimony at trial. In his deposition, Rosenblatt stated he "negotiated" the agreements on behalf of BLC. At trial, Rosenblatt asserted he had a very limited role in the negotiations. He elaborated by stating his involvement was limited to the following: (1) introducing Doyel and the Natomas project to BLC; (2) making several presentations to the Landowners about BLC, the entitlement process, and his qualifications regarding entitling developments; (3) meeting with Landowners as part of the due diligence team to discuss Stewart's and BLC's positions and terms; and (4) relaying Stewart's terms and BLC's positions to Diepenbrock to draft the Landowner Agreements. Rosenblatt asserted all terms and authority to act originated from Stewart, and Rosenblatt merely acted as BLC's representative. When asked about the discrepancy between his deposition and hearing testimony, Rosenblatt stated he was not asked to define "negotiate" at his deposition, and if he had been asked he would have elaborated on the extent of his role in the same fashion he did so at the hearing. The arbitrator found this explanation disingenuous.

The arbitrator noted the other evidence presented on the extent of Rosenblatt's role with the Landowner Agreements was slim. Although Stewart and Diepnbrock participated in formation of the Landowner Agreement, they were not asked very many questions about the negotiation process. The arbitrator explained, "Neither side asked [Stewart] either what his participation [n]or . . . Rosenblatt's participation were in the negotiations. [Diepenbrock] testified it was her belief that . . . Rosenblatt reported directly to . . . Stewart and that, on occasion, she dealt directly with . . . Stewart as well." Diepenbrock testified that when she prepared the documents she used

18

information from Rosenblatt "'only in a general sense.'" The arbitrator noted neither side called Doyel, the landowner's representative, to testify as to the scope of Rosenblatt's involvement.

The arbitrator concluded that although the testamentary evidence was lacking, it would be reasonably inferred from the documentary evidence that Rosenblatt played a larger role in the negotiations that what he testified to. She stated there were e-mails, letters, and other evidence showing the ultimate terms of any agreement had to be approved by Stewart, but Rosenblatt was "heavily involved in negotiating the Landowner Agreements."

Based on this factual determination, the arbitrator focused its attention on the issue of whether Rosenblatt required a real estate license to negotiate the Landowner Agreements on BLC's behalf. She concluded it was not.

The arbitrator analyzed this legal issue as follows: Under the statutory scheme, a real estate license would be required if Zephyr negotiated the transfer of real property or a business opportunity between the landowners and BLC. The arbitrator began with the premise there was no legal authority defining Landowner Agreements, such as the one in this case, as being an interest in real estate or a business opportunity. The arbitrator concluded it was neither.

The arbitrator concluded there was no transfer of real property when development rights are conveyed and BLC's reliance on the property taxation case *Mitsui Fudosan (U.S.A.), Inc. v. County of Los Angeles* (1990) 219 Cal.App.3d 525 (*Mitsui*), was misplaced. She determined the Landowner Agreement did not qualify as a business opportunity because it is defined as the sale of an *existing* business or opportunity. The arbitrator stated *Salazar v. Interland, Inc.* (2007) 152 Cal.App.4th 1031, defined the transfer of a business opportunity as the transfer of assets that are essential to a business and it cannot continue without them. Neither definition was applicable. "The only business being conducted on the subject properties prior to the Landowner Agreements

19

was farming; the landowners continue to farm to this day. The subject of the Landowner Agreement was developmental rights, the right to develop the properties for commercial and/or residential use at some point in the future. No such use of the properties existed at the time of the execution of the Landowner Agreements. Therefore no real estate license was required to assist in securing the Landowner Agreements or other land agreements, whether by negotiating the agreements or otherwise."

The Arbitrator awarded Zephyr $519,000 for past due monthly payments. She granted declaratory relief regarding the bonus, ruling the bonus provision was enforceable, and when any portion of the Natomos project land was sold, BLC must pay four percent of the gross proceeds to Zephyr.

*E. Petition to Confirm Arbitration Award*

Zephyr filed a petition to confirm the award. BLC filed an opposition and asked the court to vacate the award. After considering the parties briefing and argument, Judge Charles Margines issued a 19-page minute order confirming but modifying the award.

The court recognized the scope of judicial review of an arbitration award was limited, but an award must be vacated if the arbitrator exceeded her powers by enforcing an illegal contract. The court concluded that due to claims of illegality, it was required to conduct a de novo review of the award.

The court recited the facts and legal arguments raised by both parties. It recited the relevant portions of the Agreement and Landowner Agreements. It also summarized the arbitrator's conclusions and the applicable standard of review to be applied when a party claims the arbitrator enforced an illegal contract.

The court agreed with the arbitrator's conclusion there was nothing on the face of the Agreement requiring Zephyr/Rosenblatt to have a real estate broker's license. It was not on its face an illegal contract.

20

The court framed the issue to be decided as whether the work actually performed, for which payment was sought, required a real estate broker's license. The court explained, "If the [Agreement] required Zephyr to perform work for which no real estate license was required but called for payment to him for prior work for which a license was required, an award compensating Zephyr for the prior work would be in excess of the arbitrator's powers, as it would enforce an illegal contract."

The court focused on the arbitrator's factual finding that Rosenblatt was "heavily involved in negotiating the Landowner Agreements." It determined, the question was whether the "*work actually performed by Zephyr/Rosenblatt for which payment [was] sought*" required a real estate license. The trial court disagreed with the arbitrator's legal conclusion on this point and determined a license was required.

The court stated the purpose of the Landowner Agreement was to convey to BLC all the development rights in the land. BLC was also given rights as attorney-in-fact as to all matters relative to obtaining the entitlements, marketing, and sale of the land. The court recognized the Business and Professions Code did not provide a definition of real property in the context of real estate licenses, and it found instructive the definition of real property found in Health and Safety Code section 33390 [for purposes of eminent domain].

A redevelopment agency can use the power of eminent domain to acquire interest in real property, but not interests in person property. As such, Health and Safety Code section 33390 defines real property as meaning, "(a) Land, including land under water and waterfront property. [¶] (b) Buildings, structures, fixtures, and improvements on the land. [¶] (c) Any property appurtenant to or used in connection with the land. [and] [¶] (d) Every estate, interest, privilege, easement, franchise, *and right in land*, including rights-of-way, terms for years, and liens, charges, or encumbrances by way of judgment, mortgage, or otherwise and the indebtedness secured by such liens." (Italics added.)

21

The trial court reasoned, "Although the aforequoted statute is not at issue herein, it does assist the court in analyzing the central issue in the instant petitions: 'Real property' includes '[e]very right in land.' If the transfer of development rights from the Landowner to Brookfield constitutes a 'purchase, sale or exchange of real property,' the negotiation of these Landowner Agreements would fall within the meaning of [section] 10131[, subdivision] (a) and would require a real estate broker's license." The court concluded it was undisputed Rosenblatt directly negotiated with the landowners "to, in effect, acquire an interest in the property to develop the property with the landowners. . . . [¶] This is consistent with a conclusion that the Landowner Agreements transferred a real property interest."

The court asked the parties to brief the issue of how much money Zephyr was entitled to recover for work it legally performed under the Agreement, i.e., for work that did not require a real estate license. The hearing was continued.

The matter was heard in November 2013 by a different trial judge, Judge Ronald L. Bauer. The court determined the $15,000 monthly payments were designed to be a regular salary regardless of the services provided. In contrast, the bonus was for services provided, and the court calculated the amount of services performed on the Natomas project. It concluded that in 2001 and 2002, Zephyr worked full time for BLC, spending half of this time on negotiating Landowner Agreements and devoted the other half to acquisition and entitlement work. The court explained, this 50:50 split was based on Rosenblatt's declaration. The court calculated how much time Zephyr/Rosenblatt worked on Natomas in the years 2003-2006 and concluded 2/9th of Rosenblatt's efforts were "devoted to non-compensable brokerage work" and therefore his four percent bonus would be reduced to 3.1 percent.

The court noted, "These figures may seem arbitrary. In that sense, they share the weaknesses of the parties' proposals. However, they differ from the suggestions of the Petitioner and the Respondent in that they are the product of an

22

unbiased evaluation and are based, to the extent possible, on evidence in the record.  No time records were kept.  No bills were submitted.  There is surprisingly little correspondence or documentation.  Memories are imperfect of events that are now more than [10] years distant."

The court denied the petition to vacate and granted the petition to confirm the award, subject to the modification that the bonus compensation would be reduced from 4 percent of the gross proceeds to 3.1 percent.  "Those payments can be made as and when the subject parcels are effected."  Both parties appealed the order.

## II

On one hand, BLC argues it drafted and executed an illegal real estate brokerage agreement, the illegal provisions cannot be severed, and therefore, this court must vacate the arbitration award that enforces the illegal contract.  On the other hand, Zephyr asserts the arbitration award is not subject to judicial review because the alleged illegality goes only to a portion of the Agreement, and in any event, no activities performed by Zephyr required a real estate license.  As we will explain, the alleged illegality is severable but subject to judicial review due to an explicit legislative expression of public policy.  And after independently reviewing the issue, we conclude Zephyr did not need a real estate license to negotiate the Landowner Agreements on behalf of BLC.

### A.  *Limited Review of Arbitration Award*

When parties agree to private arbitration, the scope of judicial review is strictly limited to give effect to the parties' intent "to bypass the judicial system and thus avoid potential delays at the trial and appellate levels . . . ."  (*Moncharsh v. Heily & Blasé* (1992) 3 Cal.4th 1, 10 (*Moncharsh*).)  A court may not review the merits of the controversy between the parties, the validity of the arbitrator's reasoning or the sufficiency of the evidence supporting the arbitration award.  (*Id.* at p. 11.)  "'[I]t is within the power of the arbitrator to make a mistake either legally or factually.  When

23

parties opt for the forum of arbitration they agree to be bound by the decision of that forum knowing that arbitrators, like judges, are fallible.' [Citation.]" (*Id*. at p. 12.)

An arbitrator's decision is generally not reviewable for errors of fact or law. (*Moncharsh, supra,* 3 Cal.4th at p. 6.) Code of Civil Procedure section 1286.2 provides limited exceptions to this general rule, including when "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (Code Civ. Proc., § 1286.2, subd. (a)(4).) "[W]hether the arbitrator exceeded his [or her] powers and thus whether we should vacate [the] award on that basis is generally reviewed on appeal de novo." (*Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 918, fn. 1.) One of the ways an arbitrator exceeds its powers is by enforcing an illegal contract. (*Moncharsh, supra*, 3 Cal.4th at p. 31.)

In *Moncharsh,* our Supreme Court pointed out well established legal authority has "permitted judicial review of an arbitrator's ruling where a party claimed the *entire contract* or transaction was illegal." (*Moncharsh, supra*, 3 Cal.4th at p. 32, italics added; see e.g., *Loving & Evans v. Blick* (1949) 33 Cal.2d 603 (*Loving & Evans*); *All Points Traders, Inc. v. Barrington Associates* (1989) 211 Cal.App.3d 723 (*All Points Traders*).) The Supreme Court stated the same rule does not apply when the challenge is to a single provision of the overall contract. "[W]hen—as here—*the alleged illegality goes to only a portion of the contract* (that does not include the arbitration agreement), the entire controversy, including the issue of illegality, remains arbitrable. [Citations.]" (*Moncharsh, supra*, 3 Cal.4th at p. 30, italics added.) Of course there are "limited and exceptional circumstances" permitting judicial review when the challenge is to a single provision that violates a party's statutory rights or otherwise violates "an explicit legislative expression of public policy." (*Id.* at. p. 32.)

Before deciding if the award should be upheld the threshold question is whether the reward is reviewable. Is BLC correct that the contract it drafted was entirely illegal and therefore subject to judicial review de novo? Or is Zephyr correct that the

alleged illegality only goes to a portion of the contract and none of the exceptions apply to warrant judicial scrutiny. The third possible conclusion is the award must be reviewed and this court decides de novo if the arbitrator erroneously enforced an illegal provision in the Agreement. (*Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21, 37 (*Ahdout*).)

*B. General Rules Regarding Real Estate Licenses*

Because the first issue we must decide is if the purported illegality affected just a portion or the entire agreement, it is helpful to first examine the nature of the alleged illegality. Section 10130 provides, "It is unlawful for any person to engage in the business of, act in the capacity of, advertise as, or assume to act as a real estate broker or a real estate salesperson within this state without first obtaining a real estate license from the department . . . ."

"Real estate licensees must meet experience and training qualifications (§ 10150.6), and may be required to provide proof of honesty and truthfulness (§ 10153). [Citation.] The applicant must pass a written examination to demonstrate knowledge of English and arithmetical computation common to real estate and business opportunity practices, and an understanding of 'the principles of real estate and business opportunity conveyancing, . . . the principles of business and land economics and appraisals, . . . the principles of real estate and business opportunity practice and the canons of business ethics pertaining thereto,' as well as the regulations of the Real Estate Commissioner. (§ 10153.) The purpose of these licensing requirements is to protect the public from incompetent or untrustworthy practitioners. [Citation.]" (*All Points Traders, supra,* 211 Cal.App.3d at p. 729.) "The purpose of the Real Estate Act is not to raise revenue, but to protect the public [citation], and therefore it does not by its specific terms require a person to be licensed in order to act with regard to his own property or affairs." (*Williams v. Kinsey* (1946) 74 Cal.App.2d 583, 592.)

Sections 10130 and 10131 require all real estate brokers in California to be licensed. In relevant part, section 10131, subdivision (a), defines a real estate broker as a

25

person who, for compensation negotiates one or more of the following acts: "Sells or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of real property or a business opportunity." In short, Zephyr would require a real estate business license to negotiate the purchase, sale, or exchange of real property or a business opportunity.

C. *Challenged Illegality Severable*

We note BLC is in the awkward position of arguing it drafted an illegal real estate brokerage agreement. BLC asserts on appeal that it hired Zephyr to perform services requiring a real estate license, knowing Zephyr did not have such a license. In essence, it appears that BLC is advocating the theory the Agreement was a ruse it created and it should be rewarded by not having to pay Zephyr for any services provided.

We conclude BLC's theory on appeal that the entire agreement was illegal is premised on a misreading of the terms and stated purpose of the Agreement. The arbitrator and trial court both interpreted the Agreement as having a primary purpose unrelated to services requiring a real estate license. We agree that nothing in the stated purpose of the contract or list of duties suggests a real estate license would be required. For example, the Agreement expressly stated BLC desired a consultant to render business advice, development and marketing expertise, and other services in furtherance of development of the project. Zephyr was not hired to purchase or sell real estate. The Agreement also delineated 10 specific duties that would not necessarily require a real estate license and one provision of the Agreement specifically prohibited Zephyr from receiving a real estate commission if it happened to possess a license. On its face, we found nothing in the Agreement that would require a real estate license.

The arbitrator and trial court both recognized *one of the 10* specific duties listed in the Agreement could *possibly* result in the consultant *performing work* requiring a real estate license. Specifically, BLC required the consultant to "[Assist] in securing Landowner Agreements with Landowners within the Project Area." In addition, the

bonus was defined as payment for services performed prior to and during the term of the Agreement. And, it is undisputed Zephyr helped negotiate the Landowner Agreements on behalf of BLC. Accordingly, the purported illegality relates to compensation for Zephyr's negotiation efforts, a task distinct from its other management and advisory duties.

We found *MKB Management, Inc. v. Melikian* (2010) 184 Cal.App.4th 796 (*MKB Management*) instructive on this issue. "MKB and Melikian entered into a new management agreement . . . in which Melikian as owner granted MKB 'the exclusive right to rent, lease, operate and manage' several apartment buildings." (*Id.* at p. 799.) MKB filed a complaint when Melikian failed to pay for services rendered under the management agreement. The trial court concluded the management agreement "was unlawful because its '*principal object*' was for MKB, which admittedly possessed no real estate broker's license, to provide services for which a real estate broker's license was required." (*Id.* at p. 801.) The appellate court reversed, concluding the lack of a real estate license would not preclude recovery for services for which no license was required. It reasoned, "Some of the services provided under the property management agreement required a real estate broker's license, but others did not. A broker's license was required for offering for lease and leasing apartment units and collecting rents [citations], but was not required for other management duties such as causing repairs to made, decorating, and general maintenance." (*MKB Management, supra,* 184 Cal.App.4th at p. 802.)

The *MKB Management* court explained enforceability of the contract depended on the doctrine of severability. "'Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest.' (Civ. Code, § 1599.) The doctrine of severability, codified in Civil Code section 1599, 'preserves and enforces any lawful portion of a parties' contract that feasibly may be severed.' [Citation.] If, on the other hand, a contract has only a single object and that object is unlawful, in whole or in

27

part, the entire contract is void. (Civ. Code, § 1598.) [¶] '"Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." [Citations.]' [Citations.] [¶] A contract that does not allocate consideration between lawful and unlawful services but instead provides for a single, undifferentiated payment for all services provided does not necessarily preclude severance. Severance may be available if some of the services provided are wholly independent of the unlawful object. [Citation.] In those circumstances, the court may determine the value of the lawful services and apportion the consideration accordingly. [Citation.]" (*MKB Management, supra,* 184 Cal.App.4th at p. 803, fns. omitted.)

The court also acknowledged, "If a contract is capable of severance, the decision whether to sever the illegal portions and enforce the remainder is a discretionary decision for the trial court to make based on equitable considerations. [Citation.] [¶] 'Two reasons for severing or restricting illegal terms rather than voiding the entire contract appear implicit in case law. The first is to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement—particularly when there has been full or partial performance of the contract. [Citations.] Second, more generally, the doctrine of severance attempts to conserve a contractual relationship if to do so would not be condoning an illegal scheme. [Citations.] The overarching inquiry is whether "'the interests of justice . . . would be furthered'" by severance. [Citation.]' [Citation.]" (*MKB Management, supra,* 184 Cal.App.4th at pp. 803-804.) Applied here, we conclude the Agreement required Zephyr to perform a variety of acts and the duties were capable for severance to permit Zephyr to recover for work not requiring a real estate license. There are many equitable

28

considerations in Zephyr's favor and BLC should not be permitted to gain an undeserved benefit as a result of voiding an entire agreement it drafted and profited from.

BLC's legal authority does not support its contention the purportedly illegal negotiation work tainted the entire consulting arrangement. *Phillippe v. Shapell Industries* (1987) 43 Cal.3d 1247, 1266 (*Phillippe*), is inapt. That case involved the enforcement of an oral contract for real estate brokerage fees and the Supreme Court refused to permit the broker any recovery in quantum meruit because the Legislature had expressly provided that such an oral contract was invalid and unenforceable. It reasoned brokers undergo extensive training and education to acquire and maintain their licenses, and therefore they are presumed to know the statute of frauds' requirements. (*Id.* at pp. 1260-1261.) The court rejected the theory a licensed real estate broker can assert equitable estoppel against a statute of frauds defense to an oral commission agreement in the absence of a showing of actual fraud. (*Id.* at pp. 1260-1264.)

The court briefly addressed the broker's theory the statute requiring a written agreement should not apply because he was not acting as broker but rather was a "'professional consultant in the field of subdivision land acquisition.'" (*Phillippe, supra,* 43 Cal.3d at p. 1255.) The court recognized a broker could recover under an oral agreement for services not requiring a real estate license. But it found no factual support to apply this legal theory. "Phillippe fails to cite, and we are unable to find in the record, any evidence of professional services rendered . . . other than those a broker would reasonably be expected to perform in trying to consummate a sale[.]" (*Id.* at pp. 1255-1256.) It noted the broker's pretrial pleadings also contradicted the notion he was simply a professional consultant.

The court concluded Phillippe's own evidence made clear he was acting as a broker and viewed himself as a broker. "The nature of his claimed compensation was that of a broker's fee—it was contingent on a sale, and it was in the customary amount charged by brokers. We agree with the observation that, 'if an object looks like a duck,

29

walks like a duck and quacks like a duck, it is likely to be a duck.' [Citation.] It is clear that Phillippe was acting as a broker. [¶] We view Phillippe's characterization of himself as other than a broker as semantic sleight-of-hand. Phillippe tried this case on the primary theory that he is entitled to a broker's commission. The jury found in Phillippe's favor only on his claim for a broker's commission. He now says he was never acting as a broker. Even if that were so, the general rule is that a party may not for the first time on appeal change his theory of recovery. [Citation.]" (*Id.* at p. 1256.) The court concluded the broker's agreement was subject to the requirements of section 1624, subdivision (d). (*Ibid.*)

Zephyr did not change its theory of recovery on appeal. Throughout these proceeding, Zephyr has never suggested it acted as a broker or was seeking a broker's commission. Zephyr (and Rosenblatt) always characterized the services as those of a development consultant. It was Zephyr's theory it was hired to act as a project manager and secure the necessary entitlements to develop land neither Zephyr nor BLC owned. As determined by the arbitrator, there was no factual support for the notion the bonus was a disguised commission simply because it was tied to the sale of real property. There was evidence consultant project managers are often paid bonuses based on the eventual sale of the project.

BLC's reliance on *Loving & Evans, supra,* 33 Cal.2d 603, is also misplaced. Our Supreme Court held arbitrators exceed their powers in rendering an award for an unregistered contractor. The court reasoned that a building contract with an unlicensed contractor was an illegal contract "for completion of the contract 'necessarily would involve the performance of illegal acts.' [Citation.]" (*Id.* at p. 609.) We conclude completion of the contract did not necessarily involve the performance of illegal acts. To the contrary, the purported illegal negotiations took place before the Agreement was executed. The overall purpose of the Agreement was not to compensate Zephyr for this work, but to obtain the project management skills and development experience necessary

30

for the future success of the project. Zephyr performed numerous duties required by the Agreement, and unrelated to negotiating the Landowner Agreements, from 2003 to 2011. We conclude the arbitration award does not concern enforcement of an entirely illegal contract.

*D. Public Policy Exception*

But this conclusion does not end our inquiry. As mentioned previously, the *Moncharsh* case recognized there may be limited and exceptional circumstances justifying judicial review when the purported illegality affects only a portion of the underlying contract. (*Moncharsh, supra*, 3 Cal.4th at p. 32.) Courts must vacate an arbitrator's award when it violates a party's statutory rights or otherwise violates an "explicit legislative expression of public policy." (E.g., *Ahdout, supra,* 213 Cal.App.4th at p. 38 [Contractors' State License Law "constitutes an 'explicit legislative expression of public policy,' that if not enforced by an arbitrator, constitutes grounds for judicial review"]; *Cotchett, Pitre & McCarthy v. Universal Paragon Corp*. (2010) 187 Cal.App.4th 1405, 1416, (*Cotchett*); *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 438 [applying the "limited and exceptional circumstance justifying judicial review of an award that violates an explicit expression of public policy"]; *City of Palo Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327, 334 ["The normal rule of limited judicial review cannot be avoided except in those rare cases where 'according finality to the arbitrator's decision would be incompatible with the protection of a statutory right' or where the award contravenes 'an explicit legislative expression of public policy'"].)

In the *Ahdout* case, the court concluded the building construction licensing law was enacted to protect the public from incompetence and dishonesty, and section 7031 advanced this purpose by withholding judicial aid from those who sought compensation for contract work. (*Ahdout, supra,* 213 Cal.App.4th at p. 38.) "Because section 7031 constitutes an explicit legislative expression of public policy regarding

31

unlicensed contractors, the general prohibition of judicial review of arbitration awards does not apply. The fact that section 7031 reflects an explicit expression by the *Legislature* of its public policy objectives sets this case apart from *Moncharsh*, which concerned alleged violations of the Rules of Professional Conduct that are approved by the Supreme Court, not the Legislature. (See *Moncharsh, supra*, 3 Cal.4th at p. 33; *Cotchett, supra*, 187 Cal.App.4th at pp. 1417-1418.) In *Cotchett*, which similarly concerned an arbitration award that rested on an alleged violation of the Rules of Professional Conduct prohibiting unconscionable fee arrangements, the court found that although fee agreements that violate these rules may be deemed unenforceable on public policy grounds, "it does not necessarily follow that public policy requires the court, rather than an arbitrator, to finally determine whether a fee is unconscionable" under those rules. (*Id.* at p. 1418.) By contrast, where a public policy is articulated explicitly by the Legislature, as with section 7031, courts are vested with the final word on whether the provision applies. Furthermore, whereas the court in *Moncharsh* 'perceive[d] . . . nothing in the Rules of Professional Conduct at issue in this case that suggests resolution by an arbitrator of what is essentially an ordinary fee dispute would be inappropriate or would improperly protect the public interest,' (*Moncharsh, supra*, 3 Cal.4th at p. 33) the [Contractors' State License Law] provisions are intended to protect the general public in part from the hazards of shoddy construction work, and thus judicial review of arbitration awards that allegedly fail to enforce section 7031 is appropriate." (*Ahdout, supra*, 213 Cal.App.4th at pp. 38-39.)

We conclude that like section 7013 regarding unlicensed contractors, sections 10130 and 10136 constitute explicit legislative expressions of public policy regarding unlicensed real estate agents. Section 10130 provides it is unlawful to perform certain acts (defined in section 10131) without a license. "'The purpose of the licensing requirement is to protect the public from the perils incident to dealing with incompetent or untrustworthy real estate practitioners.' [Citation.] Indeed, an unlicensed person who

32

acts as a real estate broker is subject to penal consequences. (See §§ 10139, 10185.) Moreover, section 10136 bars a person 'engaged in the business or acting in the capacity of a real estate broker or a real estate salesman' from bringing or maintaining an action 'for the collection of compensation for the performance of any of the acts mentioned in this article without alleging and proving he was a duly licensed real estate broker . . . at the time the alleged cause of action arose.'" (*GreenLake Capital, LLC v. Bingo Investments, LLC* (2010) 185 Cal.App.4th 731, 736.) This severe consequence is a explicit expression by the Legislature of its public policy objective to not compensate for activities requiring a real estate license.

We conclude the trial court correctly conducted a de novo review of the evidence to determine if the negotiation of Landowner Agreements required a real estate license under section 10130. The arbitrator's finding no license was required was not binding on the trial court. Likewise, neither the arbitrator's award nor the trial court's order on this point is binding on this court. On appeal, we must independently consider the issue.

*E.  The Award Does not Enforce an Illegal Agreement*

As stated, the Agreement compensated Zephyr for its efforts negotiating the Landowner Agreements. The issue we must decide is whether these negotiations required a real estate license. We recognize most of this work occurred before Zephyr executed the Agreement, but the issue is not moot because the Agreement also promised compensation for Zephyr's services performed "prior to and during" the term of the Agreement. There is no dispute Zephyr was heavily involved in negotiating the Landowner Agreements "prior to" its execution of the Agreement.

As recognized by the arbitrator, there is no case authority relating to whether the negotiation of these types Landowner Agreements require a real estate license. A license is required before one can negotiate "the purchase, sale or exchange of real property or a business opportunity." (§ 10131.) As described in more detail in the

33

factual summary, the Landowner Agreements transferred all of the landowner's development rights in the land to BLC. In dispute is whether the transfer of development rights is a type of conveyance of real property.

The Landowner Agreement defined the scope of the development rights at issue. The parties agreed to give BLC authority to obtain the necessary entitlements to develop and market the land and increase its value. While BLC secured the development entitlements, the landowners agreed to continue to own and farm the land.

In a separate provision of the Landowner Agreement, the landowners agreed to name BLC as their attorney-in-fact, and to act as the landowner's agent when it came time to market and sell the property. An attorney-in-fact stands in the shoes of the owner and does not require a real estate license to market and sell real property. Consequently, the only portion of the Landowner's Agreement that could require a real estate license is the transfer of development rights.

The arbitrator stated there was evidence presented at the hearing that proved entitlement consultants generally do not require real estate licenses. It rejected BLC's argument the *Mitsui* case held the transfer of development rights is the same thing as the transfer of real estate. The arbitrator was right.

In *Mitsui, supra,* 219 Cal.App.3d 525, the property developer, Mitsui, acquired three parcels of real estate in downtown Los Angeles subject to a redevelopment plan. The plan limited the density of Mitsui's planned development to a maximum floor area ratio of six square feet of building area to one square foot of parcel area. However, the plan permitted this 6/1 ratio to be exceeded "through the transfer of unused floor area ratios from other parcels within the project area." (*Id.* at p. 527) "Making use of these so-called transferable development rights or 'TDRs,' Mitsui in 1983 purchased from several adjacent landowners at a cost of $8,209,000 sufficient TDRs to permit it to construct an additional 490,338 square feet of building area, more than doubling the density which otherwise would have been permitted. [¶] [In the following tax year,] the

34

county assessor increased Mitsui's base assessment by $8,209,000 to reflect the value of the TDR transactions. This resulted in an increase in property taxes totaling $266,821.10 for the 1984-1986 tax years. Mitsui paid the taxes under protest and initiated this action" (*Ibid.*)

The question decided by the *Mitsui* court was whether the conveyance of intangible development rights (air space) between two adjoining property owners should be considered as adding assessable property value to undeveloped land giving rise to a taxable event when transferred. The appellate court held transferable development rights (TDRs) acquired by a property developer to build additional floors on a high rise were part of the bundle of rights associated with the real property. (*Mitsui, supra,* 219 Cal.App.3d at p. 530.) The court reasoned, "[A]ll property in California is taxable 'in proportion to its full value.' (Cal. Const. art. XIII, § 1(b); Rev. & Tax. Code, § 201.) For purposes of taxation '"[p]roperty" includes all matters and things, real, personal, and mixed, capable of private ownership.' ([Rev. & Tax. Code,] § 103.) 'Real estate' or 'real property,' in turn, encompasses '[t]he possession of, claim to, ownership of, or right to the possession of land.' ([Rev. & Tax. Code,] § 104, subd. (a).) [¶] The word 'land' is not specifically defined by the Revenue and Taxation Code or related property tax regulations. However, no purpose would be served by attempting to force relatively recent three-dimensional land use concepts such as TDRs into one of the cubicles reserved for traditional interests in real property. [Citation.] Virtually since its inception it has been the law of this state that '[t]he sort of property in land which is taxable under our laws is not limited to the title in fee' [citation], 'but is sufficiently comprehensive to include any usufructuary interest . . . .' [Citation.]" (*Mitsui, supra,* 219 Cal.App.3d at pp. 527-528.)

The legal instrument describing the TDRs indicated the TDRs "'shall be appurtenant to and used for the benefit of the real property owned by [Mitsui]' and that they 'shall run with the land and shall be binding upon Seller, as owner of Seller's Parcel

35

and upon any future owners.'" (*Mitsui, supra,* 219 Cal.App.3d at pp. 528-529.) The court concluded transferable development rights are valuable interests in property that justify an increase in the assessed value of the land for tax purposes. The rights are fractional interests in the complex bundle of rights arising from the ownership of land. "Whether or not TDRs are actually embodied within the definition of air rights, which already have been classified under the heading 'land' (Cal. Code Regs., tit. 18, § 124), or represent something entirely separate, they are appropriately viewed as one of the fractional interests in the complex bundle of rights arising from the ownership of land. As the density in urban areas increases, diminishing the number of sites available for new construction, the ability to exploit air space in various ways to achieve vertical expansion becomes essential. Property rights which evolve as a means of furthering such goals are properly subject to taxation." (*Mitsui, supra,* 219 Cal.App.3d at p. 528.)

"For purposes of taxation, the definitions of real property in the revenue and taxation laws of the state control whether or not they conform to definitions used for other purposes." (*Cox Cable San Diego, Inc. v. County of San Diego* (1986) 185 Cal.App.3d 368, 376.) As described in *Mitsui,* particular TDRs qualify as real property in its consideration of the assessed value of property to which those TDRs were transferred. However, the TDRs were not assessed and classified as real property *separate from* any other property. This issue was not deemed relevant in the context of assessing value of the property to which the TDRs were transferred. We therefore conclude the case is not applicable when there is a transfer of TDRs separate from any other property. There is no indication the *Mitsui* court would conclude a transfer to third party owning no land would be a taxable event. We therefore conclude the case does not support the conclusion a transfer of development rights to a third party who does not own property is equivalent to the transfer of real property for purposes of property assessment/taxation or real estate licensing laws.

36

We turn next to the trial court's legal analysis of this issue. It found relevant the definition of real estate provided in the context of eminent domain proceedings. Health and Safety Code section 33390, subdivision (d), defines the term "'Real property'" as including "Every estate, interest, privilege, easement, franchise, and right in land, including rights-of-way, terms for years, and liens, charges, or encumbrances by way of judgment, mortgage, or otherwise and the indebtedness secured by such liens." Health and Safety Code section 33391, subdivision (b), empowers a redevelopment agency to "Acquire real property by eminent domain." A simple reading of these sections discloses that the Legislature authorized redevelopment agencies to acquire a variety of interests, including franchises and mortgages, by eminent domain. The trial court, applying this definition to licensing requirements, concluded that because "real property" can include a "right in land," and because development rights are certainly a right in land, then development rights fall under the definition of real property.

We find it telling that neither party on appeal discussed the court's reasoning. BLC does not assert in its opening brief that the trial court's reasoning was correct. Perhaps this is because there is no legal authority to support the trial court's conclusion the Health and Safety Code's definition of real estate in eminent domain should be inserted into the real estate licensing laws contained in the Business and Professions Code. The licensing scheme does not define the term "real estate" and makes no cross-references to other statutory schemes. Moreover, there is no support for the trial court's conclusion intangible development rights possessed by a party *who is not the landowner* falls within the definition of Health and Safety Code section 33391 and subject to eminent domain.

We found instructive a case interpreting Health and Safety Code section 33391 as not including the rights generated by an agreement granting an option to purchase. (*San Jose Parking, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1321, 1326 (*San Jose Parking*).) An "option" or "right of first refusal" contemplates an eventual

37

purchase and sale; it does not create in the option holder an estate in the property that is the subject of the option. In *San Jose Parking,* the court referred to "a long line of cases stating that an option contract relating to the sale of land conveys *no* interest in the land. [Citations.]" (*Ibid.*) The *San Jose Parking* court also determined an agreement granting a building restriction does not create an interest in real property. While the taking of a building restriction may be compensable, the interest is not within the scope of the government's eminent domain power. (*Id.* at p. 1327.) And finally, the court considered and rejected the argument the agreement at issue created an interest in real property because it had attributes similar to a license. "Even if we were to conclude that the Agreement contains attributes of a license, case law makes clear that licenses create no interest in real property. [Citations.]" (*Id.* at p. 1329.) Licenses are noncompensable in eminent domain proceedings.

The goals and purposes behind granting the government broad eminent domain powers are not the same as the regulation of real estate licensing to protect the public. "The power of eminent domain arises as an inherent attribute of sovereignty that is necessary for government to exist. Properly exercised, the eminent domain power effects a compromise between the public good for which private land is taken, and the protection and indemnification of private citizens whose property is taken to advance that public good." (*Burbank-Glendale-Pasadena Airport Authority v. Hensler* (2000) 83 Cal.App.4th 556, 561.) On the other hand, the purpose of the real estate licensing laws is much narrower. That statutory scheme is designed to protect the public from untrained or dishonest practitioners negotiating real estate deals. We conclude the trial court's reliance on eminent domain legislation to interpret a licensing issue was misguided.

We conclude the Landowner Agreement transferred to BLC is something more akin to a license than a tangible right in real estate. The agreement gave BLC authority to perform acts, such as obtaining entitlements, on the property owned by the

38

landowner, with the permission of the landowner. The Agreement conveyed to BLC a personal privilege to act on behalf of the landowner in obtaining development rights for the landowner's ultimate benefit. This arrangement is similar to a licensing agreement, which confers only "'a personal, revocable and unassignable permission to do one or more acts on the land of another without possessing any interest therein.'" (*Beckett v. City of Paris Dry Goods Co.* (1939) 14 Cal.2d 633, 637; accord *San Jose Parking, supra,* 110 Cal.App.4th at p. 1329.) The license holder does not possess any estate or interest in the property to which the license is subject. (*Von Goerlitz v. Turner* (1944) 65 Cal.App.2d 425, 429-430.)

The Landowner Agreement did not convey a deed of trust or other instrument conveying an interest in the real property. The Landowner Agreement specified the landowners would continue to hold full title to their properties and continue to use the land for farming. A real estate license was not required for the landowners to give BLC permission to act on their behalf and oversee the task of obtaining and securing future development rights. The contracts memorializing the landowners' permission to act and outlining the scope of management duties authorized on their behalf, are not the type of services requiring a real estate license. Accordingly, we conclude the arbitrator was correct and the portion of BLC's Agreement promising to compensate Zephyr for negotiating Landowner Agreements was legal and enforceable.

39

III

We reverse the trial court's ruling confirming but modifying the arbitration award. We order the trial court to enter a ruling confirming the arbitration award without modification. Zephyr shall recover its costs with respect to both the appeal and the cross-appeal.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.

40